# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

September 21, 2010

No. 09-40889

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

RAFAEL GONZALEZ-RODRIGUEZ,

Defendant - Appellant

Appeal from the United States District Court
for the Southern District of Texas

Before HIGGINBOTHAM, DAVIS, and BENAVIDES, Circuit Judges.

FORTUNATO P. BENAVIDES, Circuit Judge:

Defendant-Appellant Rafael Gonzalez-Rodriguez appeals his conviction for

possession with intent to distribute more than 500 grams of methamphetamine.

Gonzalez-Rodriguez contends that the evidence presented at trial was

insufficient to prove beyond a reasonable doubt that he knowingly possessed a

controlled substance.    Gonzalez-Rodriguez further contends that the

Government presented improper expert opinion testimony on an ultimate issue,

No. 09-40889

and also presented improper drug courier profile testimony. Lastly, Gonzalez-Rodriguez asserts that the Government violated the Speedy Trial Act by failing to indict him within thirty days of his arrest. For the following reasons, we affirm Gonzalez-Rodriguez's conviction.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On the night of January 31, 2009, Gonzalez-Rodriguez drove a Freightliner tractor-trailer to the immigration checkpoint in Falfurrias, Texas. Gonzalez-Rodriguez was accompanied by his son, Jose De Jesus Gonzalez-Lopez.[1] The Freightliner was carrying a shipment of grapefruits destined for a Costco warehouse in Dallas, Texas. The grapefruits had been loaded earlier that day at Interstate Fruit and Vegetable Company, Inc. in Donna, Texas, a city near the Mexican border.

Border Patrol Agents Abel Quintana and Victor Valdez were on duty at the Falfurrias checkpoint when Gonzalez-Rodriguez arrived at approximately 11:26 P.M. Agent Valdez is a trained K-9 handler and was with his canine, Ringo. As Gonzalez-Rodriguez approached the primary inspection area, Ringo pulled Agent Valdez to the back of the Freightliner. Agent Valdez signaled to Agent Quintana

---

[1] An application for Texas certificate of title, found inside the Freightliner, shows that Gonzalez-Rodriguez transferred title of the Freightliner to his son's wife, Evelyn Gonzalez, on January 22, 2009.

2

No. 09-40889

that Ringo had alerted to the trailer, and Agent Quintana asked Gonzalez-Rodriguez to drive to a secondary inspection area.

At secondary inspection, Agent Valdez noticed a shiny new silver lock on the trailer and asked Gonzalez-Rodriguez to open the trailer door. After Gonzalez-Rodriguez opened the door, Ringo jumped on top of grapefruit bins stacked two high and ran full speed to the front of the trailer. Ringo started digging through a particular bin of grapefruits. Agent Valdez crawled to the area where Ringo was digging, moved some bags of grapefruits, and discovered bundles bearing an image of the grim reaper. Agent Valdez, with the assistance of other agents, ultimately recovered 124 such bundles weighing a total of 312.5 pounds. The bundles had been placed in the center of five different grapefruit bins, with grapefruits layered on all sides. The bundles contained extremely high quality methamphetamine, referred to as "ice" due to its purity, with an estimated street value of $10 to $40 million.

A bill of lading and log book were recovered from the Freightliner. The bill of lading was prepared by Interstate Fruit and indicates that Order 5349 contained 40 bins of 15-pound bags of grapefruit destined for a Costco warehouse in Dallas. Interstate Fruit's shed foreman testified that Order 5349 left Interstate at 12:56 P.M. The log book's latest entry, on the other hand, states

3

No. 09-40889

that "Pickup #4359" was made at  9:45 P.M.  The log book was signed by Gonzalez-Rodriguez.  It normally takes about one and one-half hours to drive from Interstate Fruit's warehouse in Donna to the immigration checkpoint in Falfurrias.

Gonzalez-Rodriguez was arrested on January 31, 2009 and made an initial appearance before a magistrate judge on February 2, 2009.  The Government made an oral motion for pretrial detention at the initial appearance, and the magistrate judge entered an order of temporary detention pending hearing. After a detention hearing on February 5, 2009, the magistrate judge denied bond and remanded Gonzalez-Rodriguez to federal custody.

On March 3, 2009, Gonzalez-Rodriguez was indicted on one count of possession with intent to distribute more than 500 grams of methamphetamine in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A).  Later that day, Gonzalez-Rodriguez moved to dismiss the indictment on grounds that his rights under the Speedy Trial Act had been violated.  On March 30, 2009, the district court held a hearing on the motion.  At the hearing, the Government conceded that the indictment was not filed within 30 days due to an oversight and miscalculation of days, but nonetheless argued that the Act was not violated because the period from February 2-5, 2009 was an excludable delay under 18 U.S.C. 3161(h)(1).

4

No. 09-40889

On April 2, 2009, the district court denied Gonzalez-Rodriguez's motion to dismiss. The district court held that the Government's oral motion for pretrial detention was a "pretrial motion" for purposes of 18 U.S.C. § 3161(h)(1)(D), and therefore the period from February 2-5, 2009 did not count towards the 30 days within which the Government needed to file an indictment.

An initial jury trial was held from April 29 - May 1, 2009. The trial ended in a mistrial after the jury was unable to reach a unanimous verdict. A second jury trial was held from June 15-16, 2009. The evidence presented in the second trial was substantially the same as in the first trial, except the government added the expert testimony of Special Agent Robert Crawford of the Drug Enforcement Administration (DEA). Drawing on over 19 years of DEA experience, Agent Crawford testified that most large quantity methamphetamine in this country is produced in Mexico by drug organizations and transported to the United States by drug couriers for distribution. He stated that he would "classify" the majority of people arrested at immigration checkpoints as couriers, and that couriers generally are at the bottom of drug organizations and do not actually handle the drugs they transport. Agent Crawford explained that this is to reduce the cost of the courier's services, and also to ensure that the courier has little information that could be traced back

5

No. 09-40889

to the broader organization.  Because drug couriers typically do not handle drugs, Agent Crawford testified that a courier probably did not hide the methamphetamine in Gonzalez-Rodriguez's trailer, and thus Agent Crawford did not expect to find, and was not surprised when he did not find, Gonzalez-Rodriguez's fingerprints on the bundles of methamphetamine.  Agent Crawford additionally testified that large drug organizations often seek couriers with no criminal history to give an appearance of legitimacy to their operation.  For a similar reason, Agent Crawford stated that drug organizations often try to hide their illegitimate contraband in seemingly legitimate places for transportation.  He explained that drugs often are hidden in "false walls, false compartments, they will put it in engines, they will put it in tires, they will put it in produce just various different particular ways."  Indeed, Agent Crawford asserted that the "first thing" he wanted to know when conducting his investigation was whether the Freightliner was carrying a "legitimate load."   Agent Crawford further testified that two drain holes in the Freightliner's trailer had been plugged, and that this indicated an effort to impede a detectable drug odor.  Finally, Agent Crawford suggested that Gonzalez-Rodriguez must have known about the drugs in the Freightliner because he falsified the Freightliner's log book.  Gonzalez-Rodriguez did not object to any of this testimony.

6

No. 09-40889

In closing argument, Gonzalez-Rodriguez drew the jury's attention to Agent Crawford's inability to find Gonzalez-Rodriguez's fingerprints on the methamphetamine, and also to Gonzalez-Rodriguez's lack of criminal history. In rebuttal, the Government argued:

> As Agent Crawford told you, he didn't expect that to be – there to be any prints there. That wouldn't make sense. That's not the way the drug organizations work. He's hired to drive it from point A to point B. The drug organization doesn't want him with his hands on the packages. They don't even want him to know exactly how much he's got on there. They don't want him probably to even know exactly where it is. That helps him out later because he doesn't know as much.
>
> * * *
>
> Now, of course, [the drug organization]'s going to look for somebody, a driver, . . . somebody without a criminal history. That's the type of person exactly they're going to be looking for.
>
> * * *
>
> Whoever lied on that log book is hiding a critical fact. He's trying to make it look like he went straight from the interstate to the checkpoint, and it didn't happen. Why would he lie? Why would he lie? There's only one reason he would lie. There's only one reason, because he's guilty, because he knows.

Gonzalez-Rodriguez did not object to the Government's argument.

Gonzalez-Rodriguez moved for a judgment of acquittal at the end of the Government's case in chief, which the district court denied. The jury ultimately

7

No. 09-40889

returned a guilty verdict on count one of the indictment, and the district court sentenced Gonzalez-Rodriguez to 235 months in prison followed by five years of supervised release. Gonzalez-Rodriguez appealed on August 27, 2009. We have jurisdiction over the district court's final judgment of conviction and sentence pursuant to 28 U.S.C. § 1291.

## II. DISCUSSION

Gonzalez-Rodriguez asserts that the evidence presented at his second trial was insufficient to prove beyond a reasonable doubt that he knowingly possessed a controlled substance. Gonzalez-Rodriguez further contends that Agent Crawford presented improper expert opinion testimony on an ultimate issue, and also presented improper drug courier profile testimony. Finally, Gonzalez-Rodriguez contends that the Government violated his rights under the Speedy Trial Act.

A. Sufficiency of the Evidence

Gonzalez-Rodriguez asserts that the evidence presented at his second trial was insufficient to prove beyond a reasonable doubt that he had knowledge of the drugs hidden in the Freightliner. Because Gonzalez-Rodriguez moved for a judgment of acquittal at trial, we review the district court's denial of his motion by examining the evidence and all reasonable inferences drawn therefrom in the

No. 09-40889

light most favorable to the verdict, and asking whether a rational trier of fact could have found the element of knowledge of possession beyond a reasonable doubt. *See United States v. Montes*, 602 F.3d 381, 388 (5th Cir. 2010).

As a general rule, a jury may infer that a defendant has knowledge of drugs in a vehicle when the defendant exercises control over the vehicle. *See, e.g.*, *United States v. Resio-Trejo*, 45 F.3d 907, 911 (5th Cir. 1995); *United States v. Mireles*, 471 F.3d 551, 556 (5th Cir. 2006). When drugs are hidden in a secret compartment, however, guilty knowledge may not be inferred solely from the defendant's control of the vehicle because there "is at least a fair assumption that a third party might have concealed the controlled substances in the vehicle with the intent to use the unwitting defendant as the carrier in a smuggling enterprise." *Resio-Trejo*, 45 F.3d at 911. In secret compartment cases, this Court requires additional circumstantial evidence that is suspicious in nature and demonstrates guilty knowledge. *See, e.g.*, *Mireles*, 471 F.3d at 556; *United States v. Franklin*, 561 F.3d 398, 403 (5th Cir. 2009); *United States v. Garza*, 990 F.2d 171, 174 (5th Cir. 1993).

There is sufficient suspicious circumstantial evidence in this case to support Gonzalez-Rodriguez's conviction. First, although Gonzalez-Rodriguez's mere control of the Freightliner is insufficient to prove his knowledge of the

concealed drugs, *see United States v. Pennington*, 20 F.3d 593, 598 (5th Cir. 1994), control is still a factor that the jury may consider.  A packing house manager and shed foreman at Interstate Fruit testified that it would have been almost impossible for the methamphetamine to be loaded into the Freightliner without detection at Interstate Fruit's warehouse.  The packing house manager testified that a driver becomes responsible for a load once he signs a bill of lading and leaves Interstate Fruit, and the shed foreman testified that the load of grapefruits was turned over by Interstate Fruit to Gonzalez-Rodriguez at 12:56 P.M.  A reasonable jury could infer from this evidence that the methamphetamine was concealed in the grapefruit load only after it left Interstate Fruit's warehouse, and only after Gonzalez-Rodriguez became responsible for the load.  Moreover, a general manager from Costco testified as to the difficulty of unloading drugs from a trailer without detection at Costco's Dallas distribution center.  A reasonable jury could rely on this testimony to discredit an assumption that a third party planned to secretly unload the methamphetamine at Costco's facility.  Together, evidence that the methamphetamine was not loaded at Interstate Fruit's warehouse and was unlikely to be unloaded at Costco's facility suggests that the methamphetamine was in fact loaded while the Freightliner was under Gonzalez-Rodriguez's

10

responsibility and control. This is suspicious circumstantial evidence that Gonzalez-Rodriguez knew drugs were in the Freightliner.

Second, a reasonable jury could find that there was a suspicious gap in time between when Gonzalez-Rodriguez left Interstate Fruit's warehouse and arrived at the Falfurrias immigration checkpoint. The evidence indicates that Gonzalez-Rodriguez left Interstate Fruit with the grapefruits at 12:56 P.M. The evidence also indicates that Gonzalez-Rodriguez did not arrive at the Falfurrias checkpoint until 11:26 P.M., although the trip usually takes only about one and one-half hours. The jury could have inferred from this gap of approximately nine hours that there was sufficient opportunity to load the methamphetamine bundles into the Freightliner while it was under Gonzalez-Rodriguez's control. It is true that the log book, bearing Gonzalez-Rodriguez's signature, states that Gonzalez-Rodriguez picked up the grapefruit load at Interstate Fruit at 9:45 P.M. But the jury was entitled to credit the neutral testimony of Interstate Fruit's shed foreman over Gonzalez-Rodriguez's self-serving log book.

Third, Agent Valdez testified that the trailer's lock looked shiny and new and was a heavier type of lock than he typically observed at the immigration checkpoint. Agent Valdez also testified that Gonzalez-Rodriguez had a key to the lock and was able to open the trailer at the checkpoint. The jury could

reasonably infer that Gonzalez-Rodriguez had control over the contents placed in the trailer, and that the drugs could not have been concealed in or removed from the trailer without Gonzalez-Rodriguez's knowledge. This inference would be supported by the meticulous and apparently time consuming manner in which the methamphetamine bundles were hidden in the grapefruit bins.

Fourth, there is evidence that Gonzalez-Rodriguez was transporting 312.5 pounds of methamphetamine worth approximately $10 to $40 million. A jury could reasonably infer that Gonzalez-Rodriguez would not have been entrusted with such a large amount and high value of methamphetamine unless he knew he was part of the drug trafficking scheme. *See United States v. Villarreal*, 324 F.3d 319, 324 (5th Cir. 2003) (finding jury could reasonably infer knowledge from presence of drugs worth $300,000). This is particularly true when, as here, there is evidence that it would have been very difficult to unload the drugs without detection at the truck's final destination.

Taken together, this circumstantial evidence is suspicious, and it is also sufficient for a reasonable jury to conclude beyond a reasonable doubt that Gonzalez-Rodriguez knew the drugs were in the Freightliner. Gonzalez-Rodriguez's conviction is therefore AFFIRMED.

No. 09-40889

Briefly, we acknowledge Gonzalez-Rodriguez's contention that the Government failed to provide sufficient evidence that he knew the *type* and *quantity* of drugs in the Freightliner. As Gonzalez-Rodriguez recognizes, this ground for reversal is foreclosed by Fifth Circuit precedent. In *United States v. Gamez-Gonzalez*, we held that the Government was not required to prove a defendant's knowledge of drug type and quantity in a drug prosecution under 21 U.S.C. § 841. 319 F.3d 695, 700 (5th Cir. 2003). Gonzalez-Rodriguez draws our attention to the Supreme Court's recent decision in *Flores-Figueroa v. United States*, 129 S. Ct. 1886, 173 L. Ed. 2d 853 (2009), a case involving a prosecution for identity theft under 18 U.S.C. § 1028(A)(a)(1). In *Flores-Figueroa*, a defendant was convicted of "knowingly . . . possess[ing] . . . without lawful authority, a means of identification of another person." 129 S. Ct at 1889. The Supreme Court held that the Government was required to prove that the defendant both knowingly possessed the means of identification, and also knew that the means of identification in fact belonged to another person. *Id*. at 1894. We have recently held that *Flores-Figuroa* did not overrule *Gamez-Gonzalez*, and confirmed that the Government need not prove a defendant's knowledge of the type and quantity of drugs. *United States v. Betancourt*, 586 F.3d 303, 309 (5th

13

No. 09-40889

Cir. 2009). We follow this precedent in affirming Gonzalez-Rodriguez's conviction.

## B. Agent Crawford's Testimony

Gonzalez-Rodriguez contends that we should reverse his conviction on grounds that Agent Crawford offered an expert opinion on the ultimate issue of knowledge. Relatedly, Gonzalez-Rodriguez also contends that we should reverse on grounds that Agent Crawford presented impermissible drug courier profile evidence. Although we find plain error, we do not find reversible error.

### 1. Basic Principles

We review the admission of Agent Crawford's testimony for plain error because Gonzalez-Rodriguez did not object to the testimony at trial. *United States v. Ramirez-Velasquez*, 322 F.3d 868, 878-79 (5th Cir. 2003). We may not correct an error that a defendant failed to raise in the district court unless the error is plain and also affects the defendant's substantial rights. *See United States v. Garcia*, 567 F.3d 721, 726 (5th Cir. 2009); Fed. R. Crim. P. 52(b). An error is plain if it is at least "clear under current law." *United States v. Olano*, 507 U.S. 725, 734 (1993). We have stated that the error must be "so clear or obvious that the trial judge and prosecutor were derelict in countenancing it, even absent the defendant's timely assistance in detecting it." *United States v.*

14

No. 09-40889

*Trejo*, 610 F.3d 308, 319 (5th Cir. 2010) (internal quotations omitted). As a general rule, an error affects a defendant's substantial rights only if the error was prejudicial. *Olano*, 507 U.S. at 734. Error is prejudicial if there is a reasonable probability that the result of the proceedings would have been different but for the error. *See United States v. Holmes*, 406 F.3d 337, 365 (5th Cir. 2005) (citing *United States v. Dominguez Benitez*, 542 U.S. 74, 81, 124 S. Ct. 2333, 2339, 159 L. Ed. 2d 157 (2004)). The probability of a different result must be sufficient to undermine confidence in the outcome of the proceedings. *Id.* The defendant bears the burden of demonstrating that a plain error affects his substantial rights. *Olano*, 507 U.S. at 734-35. Finally, even if a plain error affects a defendant's substantial rights, we do not exercise our discretion to correct the error unless it seriously affects the fairness, integrity, and public reputation of the judicial proceeding. *Id.* at 735; *United States v. Mares*, 402 F.3d 511, 520 (5th Cir. 2005). When a defendant does not timely object to an error at trial, satisfying the requirements for error correction is "difficult, as it should be." *Puckett v. United States*, 129 S. Ct. 1423, 1429, 173 L. Ed. 2d 266 (2009) (quotations omitted).

Under the Federal Rules of Evidence, a qualified expert witness may offer reliable opinion testimony if specialized knowledge will assist the trier of fact to

15

No. 09-40889

understand the evidence or to determine a fact in issue.  Fed. R. Evid. 702.  In a criminal case, however, an expert witness may not offer an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged.  Fed. R. Evid. 704(b).  The ultimate issues in a criminal case "are matters for the trier of fact alone."  *Id.* Thus, although we have held that a qualified narcotics agent typically may testify about the significance of certain conduct or methods of operation unique to the drug business so long as the testimony is helpful and its relevance is not substantially outweighed by the possibility of unfair prejudice or confusion, *see United States v. Garcia*, 86 F.3d 394, 400 (5th Cir. 1996); *United States v. Washington*, 44 F.3d 1271, 1282-83 (5th Cir. 1995) (collecting authorities); Fed. R. Evid. 403, we have also recognized that such testimony is not admissible if it amounts to the "functional equivalent" of an opinion that the defendant knew he was carrying drugs, *United States v. Gutierrez-Farias*, 294 F.3d 657, 663-64 (5th Cir. 2002).

A drug courier profile is a compilation of characteristics used by law enforcement officers to identify individuals who might be involved in the trafficking of narcotics.  *See United States v. Williams*, 957 F.2d 1238, 1241-42 (5th Cir. 1992).  In cases involving pure profile evidence, law enforcement

16

personnel seek to testify that because a defendant's conduct matches the profile of a drug courier, the defendant must have known about the drugs he was transporting. *See United States v. Sanchez-Hernandez*, 507 F.3d 826, 832 (5th Cir. 2007). We have repeatedly held that drug courier profile evidence is "inadmissible to prove substantive guilt based on similarities between defendants and a profile." *United States v. Brito*, 136 F.3d 397, 412 (5th Cir. 1998); *see also United States v. Mendoza-Medina*, 346 F.3d 121, 128 (5th Cir. 2003); *Gutierrez-Farias*, 294 F.3d at 662; *Williams*, 957 F.2d at 1241. This is because profile evidence may amount to the functional equivalent of an expert opinion that the defendant knew he was carrying drugs, *see Mendoza-Medina*, 346 F.3d at 128; Fed. R. Evid. 704(b), and also because profile evidence is likely to be overinclusive and its probative value low in relation to its prejudicial effect, *see Williams*, 957 F.2d at 1242; Fed R. Evid. 403. That an individual fits a generic drug courier profile does not mean that the individual knew he was carrying drugs in a particular case, and "[i]t is the evidence showing the person's connection to drug trafficking that must form the basis for the conviction." *Williams*, 957 F.2d at 1242. Although the Government may introduce evidence that the defendant exhibited the individual behaviors that make up a drug

No. 09-40889

courier profile, the Government may not define the profile or suggest that the defendant's behavior in fact fit the profile. *Id.*

## 2. Agent Crawford's Statements

As suggested above, there is a fine but critical line between expert testimony concerning methods of operation unique to the drug business, and testimony comparing a defendant's conduct to the generic profile of a drug courier. The former may permissibly help a jury understand the significance and implications of other evidence presented at trial. *See Garcia,* 86 F.3d at 400 (upholding agent's testimony as to how large drug trafficking organizations operate); *Sanchez-Hernandez,* 507 F.3d at 832 (same). The latter may impermissibly suggest that an innocent civilian had knowledge of drug activity. *See Mendoza-Medina*, 346 F.3d at 129; *United States v. Ibarra*, 493 F.3d 526, 532 (5th Cir. 2007); *Gutierrez-Farias*, 294 F.3d at 663; *Ramirez-Velazquez*, 332 F.3d at 878-79; *Williams*, 957 F.2d at 1241. In determining which side of the line testimony falls in any particular case, context is necessarily important. *See Williams*, 957 F.2d at 1241-42. The inquiry does not turn on magic words, and the purpose of the inquiry must be to determine whether expert testimony is the "functional equivalent" of an opinion that the defendant knew he was carrying drugs. *Gutierrez-Farias*, 294 F.3d at 663-64.

18

No. 09-40889

Gonzalez-Rodriguez contends that the district court committed reversible error in permitting Agent Crawford to testify that: (a) drug organizations seek couriers to transport drugs; (b) large drug organizations seek couriers with no criminal history; (c) drug organizations often try to conceal drugs in legitimate places; (d) the majority of people arrested at checkpoints are couriers; (e) the "first thing" Agent Crawford wanted to know when conducting his investigation was whether the Freightliner was carrying a "legitimate load"; (f) a courier probably would not have been the person who hid the methamphetamine in the grapefruit load; (g) Agent Crawford was not surprised that Gonzalez-Rodriguez's fingerprints were not found on the methamphetamine because couriers' fingerprints rarely are found on the drugs they transport; (h) two drain holes in the Freightliner's trailer had been blocked to impede a detectable drug odor; and (i) Gonzalez-Rodriguez must have known about the drugs because he falsified the Freightliner's log book. Gonzalez-Rodriguez did not object to any of this testimony. Although we conclude that the district court plainly erred in admitting some of the testimony, we also find that the error did not affect Gonzalez-Rodriguez's substantial rights.

(a) No Error

19

No. 09-40889

As a preliminary matter, we find that the district court did not err in permitting Agent Crawford to testify that most large quantity methamphetamine is produced in Mexico; that drug organizations use couriers to transport drugs to the United States for distribution; that drug organizations often transport drugs by hiding them in seemingly legitimate places; that couriers normally do not handle drugs; that a courier probably would not have been the person who hid the methamphetamine in the grapefruit; and that Agent Crawford therefore was not surprised when he did not find Gonzalez-Rodriguez's fingerprints on the bundles of methamphetamine. This testimony discusses the basic business model for running large quantity methamphetamine across the border from Mexico to the United States. *See Sanchez-Hernandez*, 507 F.3d at 832-33 (upholding admission of testimony about how drugs and are typically smuggled across the Rio Grande River); *Garcia*, 86 F.3d at 400 (upholding admission of testimony that large drug trafficking organizations commonly use 'car swaps,' 'stash houses,' and conduct 'heat runs.'"). This is specialized information that would help a jury understand why the methamphetamine was hidden the way it was, and also rebut Gonzalez-Rodriguez's emphasis that his fingerprints were not found on the methamphetamine. *See Sanchez-Hernandez*, 507 F.3d 833 (upholding admission

20

of "not pure profile evidence" when offered to rebut defendant's innocent explanations). Furthermore, this testimony is not pure drug courier profile testimony. Although the testimony describes the typical role of a drug courier in a large drug organization, it does not describe the telltale signs of a drug courier itself. In other words, the testimony does not provide a basis for distinguishing a drug courier from an unsuspecting innocent citizen. The testimony thus presents relatively little risk that Gonzalez-Rodriguez's conviction would be based on evidence other than his actual connection to the drug trafficking crime. Finally, Agent Crawford's testimony that drug couriers typically do *not* handle and hide the drugs they transport is not the "functional equivalent" of an opinion that Gonzalez-Rodriguez knew he was transporting the drugs in this case. Agent Crawford's testimony may have helped explain why Gonzalez-Rodriguez's fingerprints were not found on the bundles of methamphetamine, but it did not express an opinion that Gonzalez-Rodriguez was in fact a courier, or that Gonzalez-Rodriguez in fact knew of the presence of drugs. For all of these reasons, we find that the above aspects of Agent Crawford's testimony would have been helpful to the jury and were not the functional equivalent of an opinion on the ultimate issue of knowledge or impermissible drug courier profile testimony.

No. 09-40889

Separately, we find that there was no error in permitting Agent Crawford to testify that two drain holes in the Freightliner's trailer had been blocked to mask a detectable drug odor. Agent Crawford had personal knowledge of the blocked drain holes through his investigation, and he expressed an opinion, based on his extensive experience, that the blockage was designed to conceal drug odors from trained canines. This testimony simply described the state and significance of the crime scene as Agent Crawford found it. The testimony did not implicate the profile of a typical drug courier, and it also did not express an opinion that Gonzalez-Rodriguez knew he was transporting drugs. The testimony was admissible.

(b) Plain Error

Other aspects of Agent Crawford's testimony went beyond the mere methods of operation unique to the drug business. Agent Crawford's testimony that drug couriers generally have no criminal history is classic profile testimony: it describes a characteristic used by law enforcement officers to identify an individual who might be a drug courier. *See Mendoza-Medina*, 346 F.3d at 127 (rejecting expert testimony that drug couriers generally bring their wives and children along to mask the drug trafficking offense). Agent Crawford's testimony suggested to the jury that Gonzalez-Rodriguez was a drug courier

22

No. 09-40889

*because* he had no criminal history. Indeed, the Government argued in closing that an individual with no criminal history is "the type of person exactly they're going to be looking for." Suggesting to the jury that Gonzalez-Rodriguez was a drug courier because he had no criminal history is not only overbroad and unhelpful, it is also the functional equivalent of an opinion that Gonzalez-Rodriguez knew he was carrying drugs because he had no criminal history. It was plain error to admit this testimony.

Similarly over the line was Agent Crawford's testimony that the "first thing" he wanted to know when conducting his investigation was whether the Freightliner was carrying a "legitimate load," such as "produce." This testimony was not simply an explanation that drug organizations often try to conceal drugs in legitimate places for transportation. It was also a suggestion that law enforcement officers look for legitimate loads to identify drug couriers. In other words, Agent Crawford suggested that Gonzalez-Rodriguez was a drug courier *because* he was transporting a legitimate load of grapefruits. The suggestion was overbroad and unhelpful, and it was also the functional equivalent of an opinion that Gonzalez-Rodriguez knew he was carrying drugs because he knew he was carrying grapefruit. Admitting this testimony was plainly erroneous.

23

No. 09-40889

The district court also plainly erred in admitting Agent Crawford's testimony that Gonzalez-Rodriguez must have known about the drugs because he falsified the Freightliner's log book. On direct examination, the following exchange took place between the Government and Agent Crawford:

> Q. And so in your experience what's the point of falsifying a log book to show that you picked up much later in the day?
>
> A. Just based on what I see and through the early part of the investigation, that would leave me to suspect that something illegally took place.
>
> * * *
>
> Q. So in your experience would a person who knows that he's carrying drugs want to hide the fact that he took so much time from the time he picked up to the time he got to the checkpoint?
>
> A. "Yes, sir."

Pure and simple, Agent Crawford offered an expert opinion that Gonzalez-Rodriguez must have known he was carrying drugs because he falsified the Freightliner's log book. The jury was free to determine for itself whether Gonzalez-Rodriguez falsified the log book and, if so, whether this suggested knowledge of drugs. It was plain error, however, for Agent Crawford to draw the connection. *See* Fed. R. Evid. 704(b) (providing that "ultimate issues are matters for the trier of fact alone"); *see also Gutierrez-Farias*, 294 F.3d at 662-63.

24

No. 09-40889

Finally, the district court plainly erred in admitting Agent Crawford's testimony that the majority of people arrested at immigration checkpoints are couriers. This testimony implied that Gonzalez-Rodriguez was a drug courier, and therefore knew he was carrying drugs, *because* he was arrested at a checkpoint. Of course, Gonzalez-Rodriguez is presumed innocent until proven guilty, and it was the Government's burden to prove that Gonzalez-Rodriguez was properly in custody because he was a drug courier. The Government impermissibly put the cart before the horse. *See, e.g., United States v. Labarbera*, 581 F.2d 107, 108-09 (5th Cir. 1978) (stating that evidence of an arrest not admissible for the purpose of proving the conduct for which a person was arrested).

(c) Gonzalez-Rodriguez's Substantial Rights

Although plain error was committed in this case, Gonzalez-Rodriguez has failed to demonstrate that the error affected his substantial rights. As already discussed, even excluding Agent Crawford's impermissible testimony, there is still extensive evidence that Gonzalez-Rodriguez knew about the drugs in the Freightliner. *See Gutierrez-Farias*, 294 F.3d at 662; *Brito,* 136 F.3d at 412-13. The Government presented evidence that the methamphetamine was not loaded at Interstate Fruit's warehouse and was unlikely to be unloaded at Costco's

25

facility. This suggests that the methamphetamine was in fact loaded and would have been unloaded while the Freightliner was under Gonzalez-Rodriguez's responsibility and control. The testimony of Interstate Fruit's shed foreman indicates that Gonzalez-Rodriguez left Interstate Fruit with the grapefruit load at 12:56 P.M., yet Gonzalez-Rodriguez did not reach the immigration checkpoint until 11:26 P.M. This suggests a sufficient opportunity for the drugs to be meticulously hidden in the grapefruit bins while the Freightliner was under Gonzalez-Rodriguez's control. There is evidence that Gonzalez-Rodriguez had the key to the lock on the trailer. This suggests that the drugs could not have been hidden in or unloaded from the trailer without Gonzalez-Rodriguez's knowledge. Finally, a jury could infer that Gonzalez-Rodriguez would not have been entrusted with 312.5 pounds of methamphetamine worth over $10 million unless he knew he was part of a drug trafficking scheme.

We recognize that Agent Crawford's testimony appears to have played an important role in this case: without Agent Crawford's testimony, the first jury failed to return a unanimous verdict; with Agent Crawford's testimony, a second jury unanimously convicted Gonzalez-Rodriguez. Were it the Government's burden to establish harmless error beyond a reasonable doubt, our conclusion today might be different. *See Ibarra*, 493 F.3d at 532; *see also Dominguez*

26

No. 09-40889

*Benitez*, 542 U.S. at 82 n.7 ("When the Government has the burden of addressing prejudice, as in excusing preserved error as harmless on direct review of the criminal conviction, it is not enough to negate an effect on the outcome of the case."). Because he did not object to Agent Crawford's testimony at trial, however, it is Gonzalez-Rodriguez's burden to demonstrate a reasonable probability that his trial would have come out differently but for the illegitimate aspects of Agent Crawford's testimony. *See Dominguez Benitez*, 542 U.S. at 81; *Holmes*, 406 F.3d at 365. We find that Gonzalez-Rodriguez has not met this burden. First, we observe that Agent Crawford's illegitimate testimony is an imperfect explanatory variable: the different results in Gonzalez-Rodriguez's trials may be explained by Agent Crawford's considerable legitimate testimony, or also by the mere presence of different jurors. Most of Agent Crawford's testimony concerned the extent of the Government's investigation into the case and methods unique to the business of smuggling large quantity methamphetamine across the Mexican border. This testimony was legitimate and pertinent and not presented at Gonzalez-Rodriguez's first trial. In other words, that Gonzalez-Rodriguez was convicted only after Agent Crawford testified tells us little. Second, although Agent Crawford's ultimate conclusions about the Freightliner's logbook were improper, his initial testimony about the

27

*contents* of the logbook was not. Even without Agent Crawford's improper opinion, it would have been straightforward for the jury to conclude that Gonzalez-Rodriguez falsified the log book based on its discrepancies with objective witness testimony, and thus to infer that Gonzalez-Rodriguez knew he was transporting drugs. Agent Crawford's ultimate opinion, although improper, was unlikely to have swayed the jury's conclusion. Finally, after reviewing the record as a whole, and in light of all the other evidence supporting Gonzalez-Rodriguez's conviction, we find no reasonable probability that the conviction hinged on Agent Crawford's testimony that drug couriers often have no criminal history, transport legitimate loads, and are arrested at immigration checkpoints. Gonzalez-Rodriguez's conviction is AFFIRMED.

C. Speedy Trial Act and Excludable Delay

Gonzalez-Rodriguez contends that the district court erred in denying his motion to dismiss the indictment under the Speedy Trial Act. We review the district court's factual findings for clear error and its legal conclusions *de novo*. *See United States v. Harris*, 566 F.3d 422, 428 (5th Cir. 2009).

The Speedy Trial Act is designed to protect a criminal defendant's constitutional right to a speedy trial, and also to serve the public's interest in prompt criminal proceedings. *United States v. Stephens*, 489 F.3d 647, 652 (5th

Cir.2007).   The Act thus provides that "[a]ny . . . indictment charging an individual with the commission of an offense shall be filed within thirty days from the date on which such individual was arrested . . . ." 18 U.S.C. § 3161(b). The Act excludes certain periods of delay, however, in computing this 30-day window.  *Id.* § 3161(h).  Specifically, the Act excludes "[a]ny period of delay resulting from other proceedings concerning the defendant," *id.* § 3161(h)(1), including but not limited to "delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion," *id.* § 3161(h)(1)(D).  We have held that the day on which a pretrial motion is made and the day on which the hearing is held are both excluded for purposes of computing excludable delay under 18 U.S.C. § 3161(h)(1)(D). *See United States v. Kington*, 875 F.2d 1091, 1107 (5th Cir. 1989). Gonzalez-Rodriguez contends that the proceedings on the Government's motion for detention do not qualify as excludable delay because an oral motion is not "fil[ed]" within the meaning of § 3161(h)(1)(D).

We see no reason why an oral motion would not trigger the excludable delay contemplated by § 3161(h)(1)(D). The Federal Rules of Criminal Procedure permit oral as well as written pretrial motions.  *See* Fed. R. Crim. P. 12(b), 47(b). The Guidelines to the Administration of the Speedy Trial Act of 1974 recognize

No. 09-40889

that the "starting date" for "delay resulting from hearings on pretrial motions" is the "[d]ate the motion is filed or made orally." Committee on the Administration of the Criminal Law of the Judicial Conference of the United States, Guidelines to the Administration of the Speedy Trial Act of 1974, As Amended, 106 F.R.D. 271, 288 (1984). Furthermore, the purpose of § 3161(h)(1)(D) is to "exclude all time that is consumed in placing the trial court in a position to dispose of a motion," *Henderson*, 476 U.S. at 331, and a formalistic distinction between written and oral pretrial motions would not advance this purpose. The four-day period from February 2-5, 2009 was time consumed in placing the district court in a position to dispose of the Government's motion to detain Gonzalez-Rodriguez pending trial. The period is therefore within the ambit of § 3161(h)(1)(D). *See United States v. Green*, 508 F.3d 195, 200 (5th Cir. 2007) (holding that "any pretrial motion" tolls the speedy trial clock). We join almost all of our sister circuits in holding that when an oral pretrial motion is made on the record with both parties present, it is "filed" just like a written motion for purposes of § 3161(h)(1)(D).[1] *Cf. United States v.*

---

[1] *See, e.g.*, *United States v. Taylor*, 497 F.3d 673, 676 (D.C. Cir. 2007) (finding former § 3161(h)(1)(F) "triggered by written and oral motions alike"); *United States v. Rodriguez*, 63 F.3d 1159, 1164-65 (1st Cir. 1995) (same); *United States v. Nixon*, 779 F.2d 126, 130-31 (2d Cir. 1985) (same); *United States v. Arbelaez*, 7 F.3d 344, 347 (3d Cir. 1993) (same); *United States v. Willis*, 996 F.2d 1213, at *1 n.2 (4th Cir. 1993) (table) (same); *United States v.*

*McKnight*, 570 F.3d 641, 650 (5th Cir. 2009) (observing that counsel "filed an oral motion"); *United States v. Dien Duc Huynh*, 246 F.3d 734, 736 (5th Cir. 2001) (same); *United States v. DeMaio*, 28 F.3d 588, 589 (7th Cir. 1994) (same, at initial appearance).

We recognize that the Supreme Court has recently stated that "only the delay that occurs '*from the filing* of the motion through the conclusion of the hearing on, or other prompt disposition of' the motion" may be excluded under § 3161(h)(1)(D). *Bloate v. United States*, 130 S. Ct. 1345, 1353, 176 L. Ed. 54 (2010). In *Bloate*, the Supreme Court held that a mere extension of time to file pretrial motions, as opposed to the filing of a pretrial motion itself, does not trigger excludable delay under § 3161(h)(1)(D). This holding does not help Gonzalez-Rodriguez. That excludable delay under § 3161(h)(1)(D) begins only upon the filing of a pretrial motion has nothing to do with whether an oral pretrial motion is deemed filed in the first place. As already discussed, we find that an oral pretrial motion made on the record with both parties present is filed for purposes of § 3161(h)(1)(D).

---

*Richmond*, 735 F.2d 208, 212 (6th Cir. 1984) (same); *United States v. Moses*, 15 F.3d 774, 776 n.3 (8th Cir. 1994) (same); *United States v. Pasquale*, 25 F.3d 948, 950-51 (10th Cir. 1994) (same); *United States v. Broadwater*, 151 F.3d 1359, 1361 (11th Cir. 1998) (*per curiam*) (same).

No. 09-40889

Not counting the period from February 2-5, 2009, Gonzalez-Rodriguez was indicted only twenty seven days after his arrest.  Because twenty-seven days is less than thirty days, we conclude that the Government did not violate the Speedy Trial Act.   Gonzalez-Rodriguez's conviction must be AFFIRMED.

## CONCLUSION

Gonzalez-Rodriguez has not shown that the evidence presented at trial was insufficient to prove beyond a reasonable doubt that he knowingly possessed with intent to distribute a controlled substance.  Gonzalez-Rodriguez also has not shown that the plainly erroneous aspects of Agent Crawford's testimony affected his substantial rights.  Finally, the proceedings against Gonzalez-Rodriguez did not violate the Speedy Trial Act.

The district court's judgment is AFFIRMED.

32