# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 18-30001

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

ERASMO AVILES, JR.,

Defendant - Appellant

United States Court of Appeals
Fifth Circuit

**FILED**
September 13, 2018

Lyle W. Cayce
Clerk

Appeal from the United States District Court
for the Western District of Louisiana
USDC No. 5:16-CR-132-1

Before JONES, BARKSDALE, and WILLETT, Circuit Judges.

PER CURIAM:[*]

Erasmo Aviles, Jr. was tried and convicted by a jury for conspiracy to possess with intent to distribute a controlled substance, possession of methamphetamine with intent to distribute, and possession of cocaine with intent to distribute. He was sentenced to 240 months in prison. He appeals his conviction, claiming (1) that the district court abused its discretion by allowing his codefendant to invoke the Fifth Amendment, (2) that the government substantially interfered with his codefendant's decision not to

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 18-30001

testify, and (3) that the government presented inadmissible testimony at his trial.  We affirm.

## BACKGROUND

On May 12, 2016, Troopers Brent Peart and George Strickland were on duty on Interstate 20.  They observed a Yukon brake heavily when approaching the troopers, even though the Yukon was not speeding.  The Yukon had a single male occupant, who leaned back in his seat while passing the troopers, thus hiding himself from view.  The troopers then noted an Impala traveling behind the Yukon.  The Impala also contained a single male occupant who hid himself from view when passing the troopers.   The troopers followed the two cars, which appeared to be traveling together.  The Yukon had temporary Texas tags and the Impala had Texas plates.  Eventually, Trooper Peart pulled over the Yukon and Trooper Strickland pulled over the Impala.

Francisco Guardiola was driving the Impala.  He told Trooper Strickland that he was on his way to meet his brother to see about a job in a refinery.  When questioned, he could not tell Trooper Strickland where the refinery was located, what town he was meeting his brother in, or the name of the company.  Guardiola appeared nervous.   He told Trooper Strickland that he was travelling alone and that the Impala belonged to his uncle.  Trooper Strickland had run the license plates of the Impala and found that it was registered to Erasmo Aviles, Jr.

Eventually, Trooper Strickland went back to his vehicle to call a K-9 unit.  He also contacted Trooper Peart, who asked him who owned the Impala.  Trooper Peart informed Trooper Strickland that Aviles was the driver of the Yukon. The K-9 Unit gave a positive alert on the Impala.  Trooper Strickland then searched the vehicle, and found approximately 975 grams of methamphetamine and 315 grams of cocaine.  Trooper Strickland placed Guardiola under arrest.  At this point, Trooper Peart contacted Trooper

No. 18-30001

Strickland and asked if he had found a camouflage two-way radio. Trooper Strickland searched the Impala and found a two-way camouflage radio set to channel two. No overnight bags, luggage, or clothing were found in the Impala.

Trooper Peart pulled over the Yukon. The driver of the Yukon was Erasmo Aviles., Jr., who stated that he was going to Jackson, Mississippi to visit a friend. Trooper Peart asked Aviles for paperwork for the vehicle, at which point Aviles handed him an insurance card for the Impala. Trooper Peart pointed out the mistake, and Aviles gave him the insurance card for the Yukon. Trooper Peart later testified that Aviles appeared extremely nervous, and frequently answered Trooper Peart's questions with questions. Trooper Peart found this suspicious, because he knew from training that people do this to buy time to come up with an answer.

Trooper Peart contacted Trooper Strickland and discovered that the Impala was registered to Aviles. He then called for backup. He returned to the Yukon, and asked Aviles if the Impala belonged to him. Aviles began sweating and stated that it did, and that his cousin was driving it. When asked why he was traveling separately from his cousin, Aviles stated that he might stay longer at their destination. Aviles consented to a search of the Yukon. Trooper Strickland then contacted Trooper Peart to tell him they had found narcotics in the Impala, and Trooper Peart arrested Aviles.

Trooper Peart searched the Yukon and found two cell phones and a camouflage two-way radio set to channel two. Trooper Peart did not find any luggage or overnight bags, but did find a jacket that he thought might be a paintball jacket.

Guardiola pled guilty without a plea agreement to conspiracy to possess with intent to distribute a controlled substance, possession of methamphetamine with intent to distribute, and possession of cocaine with intent to distribute. The government requested that his sentencing be

3

postponed until after Aviles's trial, because it "would be interested in Mr. Guardiola's role at that trial, if any, in terms of making a sentencing recommendation to" the court. Guardiola's counsel, Joseph Greenwald, stated that he did not "see the need for it . . . [because] Mr. Guardiola is not planning on participating in that trial." However, after being assured that this could only benefit Guardiola, Greenwald and the district court agreed to postpone Guardiola's sentencing.

With Greenwald's permission, Aviles's attorney, Eric Johnson, and investigator, Joseph Mann, interviewed Guardiola a week before Aviles's trial. Aviles's attorney then subpoenaed Guardiola to appear at Aviles's trial. Greenwald stated that he would advise Guardiola to plead the Fifth, and Aviles moved to compel Guardiola's testimony.

The district court held hearings regarding the Fifth Amendment issue. Mann testified that Guardiola allegedly stated that Aviles did not know about the drugs in Guardiola's car. Guardiola also told Mann that he was supposed to call someone when he got close to the drugs' delivery destination. The person's phone number was on a piece of paper, which he swallowed after being pulled over. Guardiola himself testified that Johnson advised him during the interview that he had lost his right to plead the Fifth Amendment by pleading guilty. When asked about the content of his statements to Johnson and Mann, Guardiola invoked the Fifth Amendment. The court ruled that Guardiola had validly invoked his Fifth Amendment right against self-incrimination.

Aviles was tried by a jury and convicted on all three counts. He was sentenced to 240 months in prison. On appeal, Aviles contends that the district court abused its discretion when it allowed Guardiola to plead the Fifth Amendment, and the government substantially interfered with Guardiola's decision not to testify. Aviles also challenges the admission of alleged profiling testimony by Troopers Peart and Leon Defelice.

No. 18-30001

## STANDARD OF REVIEW

We review for abuse of discretion a trial court's decision to exclude a witness based on the witness's invocation of the Fifth Amendment privilege. *United States v. Mares*, 402 F.3d 511, 514 (5th Cir. 2005). "Whether the government substantially interfered with a defendant's right to present witnesses and establish his defense is a fact question" we review for clear error. *United States v. Anderson*, 755 F.3d 782, 792 (5th Cir. 2014).

Evidentiary rulings, if preserved, are reviewed on appeal for abuse of discretion. *United States v. Ramos-Rodriguez*, 809 F.3d 817, 824 (5th Cir. 2016). But if a defendant fails to object to the ruling at trial, we review for plain error. *United States v. Gonzalez-Rodriguez*, 621 F.3d 354, 362 (5th Cir. 2010). Under that standard, Aviles must show a forfeited plain (clear or obvious) error that affected his substantial rights. *Puckett v. United States*, 556 U.S. 129, 135 (2009). If he does so, we have the discretion to correct the reversible plain error, but should do so only if it "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings". *Id. Rosales-Mireles v. United States*, 138 S. Ct. 1897, 1906 (2018) (citations and quotation marks omitted).

## DISCUSSION

1. Guardiola's Testimony

Aviles first argues that based on counsel's pretrial interview, Guardiola possessed powerful exculpatory information and should not have been allowed to invoke the Fifth Amendment and deprive Aviles of his testimony. Guardiola, he asserts, would not risk self-incrimination by testifying unless he committed perjury at Aviles's trial, which is not a valid reason to invoke the Fifth Amendment privilege. *See United States v. Whittington*, 783 F.2d 1210, 1218 (5th Cir. 1986). He disputes that Guardiola could further incriminate himself or risk sentence enhancement because he already pled guilty to all

counts in the illegal transaction. Further, his guilty plea was admissible in any potential state prosecution.

The short answer to these contentions is that the district court found otherwise, and Aviles is not in the same position of knowledge or responsibility as Guardiola's lawyer, who advised his client's invocation of the Fifth Amendment. To be sure, "a defendant's Sixth Amendment right of compulsory process to obtain witnesses in his favor must yield to a witness's Fifth Amendment privilege against self-incrimination." *United States v. Hernandez*, 962 F.2d 1152, 1161 (5th Cir. 1992) (citation omitted). The privilege "protects against any disclosures which the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used," *Kastigar v. United States*, 406 U.S. 441, 444–45, 92 S. Ct. 1653, 1656 (1972), but it does not apply when the possibility of self-incrimination is "a remote and speculative possibility." *Steinbrecher v. C.I.R.*, 712 F.2d 195, 197 (5th Cir. 1983).

A guilty plea waives the privilege with respect to the specific charges to which a defendant pled guilty but not other crimes related to the same events. *United States v. Lyons*, 703 F.2d 815, 818 n.2 (5th Cir. 1983). As Aviles observes, a plea or statements made "during the preceding plea colloquy are later admissible against the defendant." *Mitchell v. United States*, 526 U.S. 314, 324, 119 S. Ct. 1307, 1313 (1999). However, "[a] statement admissible against a defendant . . . is not necessarily a waiver of the privilege against self-incrimination." *Id.*

The privilege remains in effect if the defendant has a "legitimate fear of incurring additional criminal liability from testifying" due to impending sentencing. *Hernandez*, 962 F.2d at 1161. Even when a co-conspirator has been convicted and sentenced, this court has affirmed that a co-conspirator

may invoke his Fifth Amendment privilege when his testimony could result in a state prosecution. *United States v. Metz*, 608 F.2d 147, 156 (5th Cir. 1979).

Based on these principles, the government disagrees with Aviles's assertion that Guardiola has nothing to fear but a perjury count if he were to testify falsely in Aviles's trial. The appellant's assumption is that Guardiola could answer a few narrow questions refuting Aviles's involvement and leave the stand. It is not so simple. He could be exposed to thorough cross-examination about his own role in the broader drug conspiracy and trafficking, and the veracity of his previous statements to law enforcement (*e.g.*, that he "just met" Aviles). His statement to Mann about ingesting the paper with an inculpatory phone number could be introduced at Aviles's trial and later prosecuted under Louisiana law. La. Rev. Stat. Sec. 14:130.1 (obstruction of justice). And without a plea agreement, he could remain vulnerable to further federal charges.

The district court also found that Guardiola could become exposed to adverse sentencing consequences based on obstruction of justice or failure to accept responsibility. Guardiola's lawyer noted more generally that if his client testified and made a bad impression on the judge, that alone could harm him at sentencing.

Aviles dismisses as unfounded Guardiola's concerns about his prior contradictory statements and possible obstruction of justice, essentially because they were already memorialized in ways that could be admissible against him in court. Even if we credit such extrinsic sources, however, Aviles is wrong in concluding that no further self-incriminating damage could be done if Guardiola were forced to testify and confront such sources. The district court did not abuse its discretion by acceding to Guardiola's invocation of his Fifth Amendment privilege and not requiring him to testify.

7

No. 18-30001

Aviles did not raise this argument in the trial court but now asserts that the government substantially interfered with Guardiola's decision not to testify because it requested that Guardiola's sentencing be postponed until after Aviles's trial. Aviles contends that Guardiola's attorney would not have advised him to invoke the privilege had Guardiola already been sentenced; hence, the postponement request was a "threat to recommend sentence enhancement (or withhold a favorable recommendation)." This contention misreads the record.

At the time, the government's reasoning for a postponement was that it "would be interested in Mr. Guardiola's role at trial, if any, in terms of making a sentencing recommendation to" the court. Federal law allows a court, upon the government's motion, to impose a sentence less than the statutory minimum "to reflect a defendant's substantial assistance in the investigation or prosecution of another person." 18 U.S.C. § 3553(e). This facially benign request, in any event, did not influence Guardiola's counsel, who replied that he didn't see a need for the continuance because "Guardiola is not planning on participating in [Aviles's] trial."

We are more than dubious about Aviles's contention that a de novo standard of review should apply to this waived argument. He states he was unaware that Guardiola's sentencing had been postponed—although he reviewed the sentencing transcript in which that decision was discussed. Be that as it may, the record does not support any interference with Guardiola's decision not to testify.

2. The Drug Courier Profile Testimony

Louisiana State Trooper Leon Defelice testified as an expert witness for the government. Aviles argues that portions of Defelice's testimony were inadmissible because they improperly offered an opinion about Aviles's

8

knowledge or substantive guilt.  The contested portions of Defelice's testimony are quoted below:

- "It's common for [the courier's vehicle] to already be loaded and ready to go, without the other individual even knowing where the drugs are located. . . . And the intent is he or she knows what the trip is about, but they don't necessarily know exactly what type of narcotic and how much of the narcotic is there, or where it is, even, for that fact."

- "The drug couriers in more organized drug trafficking organizations – or DTOs – the courier, his or her job is strictly to drive the product from Point A to Point B. They are very limited on the information that they know, typically."

- "I've been involved in numerous traffic stops where two vehicles were stopped simultaneously in a scenario such as this and the trips were discovered to be credible, plausible. But in that case, even if two-way radios are used, in that case the person in Vehicle A is going to have the exact same story as the person in Vehicle 2 – Vehicle B, even to the intricate detail.

  In a criminal situation where you have two vehicles traveling with each other for the purposes of trafficking in illegal narcotics or guns or money, you're going to have usually some discrepancies in the story. There's going to be some deception."

Defelice also testified that when two vehicles travel together to transport narcotics, the "leader" of the group is normally in the vehicle without the narcotics.  In his opinion, the facts of this case were "consistent with drug trafficking" and that Aviles "would be higher up in the hierarchy" between the two drivers.

Aviles also challenges the following testimony by Trooper Peart:

Because normally when we do get two separate vehicles or more than two separate vehicles involved in smuggling, it's – there's normally a front car and there's normally a tail vehicle. Normally, the tail vehicle is the one that has the narcotics, that we've seen. So I was pretty confident that Trooper Strickland's vehicle had

9

narcotics or something illegal inside of it; so that's why I instructed the K-9 officer to go to him, in case of the driver refusing consent to search.[1]

Because Aviles did not contest this testimony at trial, its admission is reviewed under the plain error standard. *Gonzalez-Rodriguez*, 621 F.3d at 362. This court has held that "drug courier profile evidence is inadmissible to prove substantive guilt based on similarities between defendants and a profile." *Medeles-Cab*, 754 F.3d 316, 321 (5th Cir. 2014) (quotations and citations omitted). "[T]here is a fine but critical line between expert testimony concerning methods of operation unique to the drug business, and testimony comparing a defendant's conduct to the generic profile of a drug courier. The former may permissibly help a jury to understand the significance and implications of other evidence . . . . The latter may impermissibly suggest that an innocent civilian had knowledge of drug activity." *Gonzales-Rodriguez*, 621 F.3d at 364.

We need not decide whether the admission of the challenged statements was plainly wrong because Aviles cannot show that the admission affected his substantial rights.[2] "As a general rule, an error affects a defendant's substantial rights only if the error was prejudicial. Error is prejudicial if there is a reasonable probability that the result of the proceedings would have been different but for the error." *Id.* at 363 (citations omitted).

As detailed above, there was ample evidence to show that Aviles knew about the drugs in the Impala. Aviles was the owner of both vehicles, and they

---

[1] Aviles also argues in his reply brief that this testimony was inadmissible because it was impermissible background contextual evidence. This argument fails for the same reasons his drug courier profile testimony argument fails.

[2] For this reason, we also do not address the government's alternative argument that Aviles invited the error.

had identical two-way radios. Aviles's interaction with the officers was incriminating: he and Guardiola told different stories about where they were going, despite the fact that Aviles later stated they were going to the same destination. Trooper Peart testified that Aviles appeared extremely nervous and began sweating when Trooper Peart asked him about the Impala. Though Aviles had some clothes in the Yukon, he did not have an overnight bag or luggage. Aviles would answer the trooper's questions with questions, a tactic Peart recognized as an effort to gain time while Aviles was conjuring a response. Furthermore, a border patrol agent testified regarding the facts underlying Aviles's previous conviction for drug trafficking.

In sum, there was not a reasonable probability that the result would have been different without the challenged testimony.

For the foregoing reasons, Aviles's convictions are **AFFIRMED.**