# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

December 10, 2010

No. 09-40702

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff-Appellee

v.

JOSE SANTOS MORIN,

Defendant-Appellant

Appeal from the United States District Court
for the Southern District of Texas

Before DAVIS, WIENER, and DENNIS, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge.

Jose Santos Morin appeals his conviction for possession with intent to distribute more than 1,000 kilograms of marihuana in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A) and conspiracy to commit that same offense in violation of 21 U.S.C. §§ 846, 841(a)(1) and 841(b)(1)(A). Morin challenges the testimony of government witnesses as being impermissible "drug courier profiling" testimony. He also challenges a question asked by the prosecutor during trial. For the following reasons, we find no reversible plain error and affirm the district court's judgment of conviction.

No. 09-40702

I.

The district court entered a judgment of conviction against Morin after the jury found him guilty on the above-cited counts. The principal factual issue presented to the jury was whether Morin "knowingly and intentionally" possessed and conspired to possess a controlled substance. A summary of the evidence presented at trial in the light most favorable to the verdict follows.

Morin drove a tractor-trailer to the Falfurrias, Texas Border Patrol checkpoint on January 20, 2009. Juan Manuel Hernandez, whose wife owned the tractor, was a passenger in the vehicle. In response to questioning from United States Border Patrol Agent Francisco Carriaga, Morin stated that the trailer was owned by Dice Transport and that it was empty, but when asked in Spanish he responded that it was carrying cabbage. When asked about where they had picked up the load, Hernandez interrupted and stated that they had just picked up the trailer at the ISPE produce warehouse. Morin handed Agent Carriaga the bill of lading indicating that the trailer contained cabbage from the ISPE warehouse bound for a produce company in Houston, Texas. The bill of lading had been signed by Hernandez.

According to Agent Carriaga, Morin did not appear nervous. Another Border Patrol Agent, Oscar Ortiz, testified that he conducted a routine canine search around the tractor-trailer. The canine alerted to one of the drain holes above the rear tires of the trailer. Agent Carriaga then sent Morin and Hernandez to secondary inspection. The canine again alerted to the rear of the trailer. Agent Carriaga saw that the doors of the trailer were sealed, and asked Morin if he could cut the seal. Morin consented to a search of the trailer. Once Agent Carriaga opened the door, the canine jumped on top of produce boxes in the back of the trailer. Opening one of the boxes, Agent Ortiz saw black bundles hidden under layers of cabbage leaves. A search revealed 284 bundles of

No. 09-40702

marihuana weighing 3,586.18 kilograms (9,146 pounds) with an approximate street value of $7.3 million. No fingerprints were found on the bundles.

Morin and Hernandez were placed under arrest.[1] Drug Enforcement Agency ("DEA") Agents Xavier Bedoya and Suzanne Minnick arrived at the scene later that day. Morin agreed to give the DEA agents a statement. According to the DEA agents, Morin told them the following. Hernandez had called him the day before at his home in Mission, Texas and asked him if he wanted to go to Houston to deliver a load of cabbages, and Morin agreed to go. Morin's wife and children were at his sister's house in a nearby town that night. Morin had a friend named Oscar Cantu call a taxi for him, which picked him up at his home around 11:30 p.m. on January 19 and dropped him off at a Jack in the Box restaurant. Hernandez arrived at the restaurant at approximately 12:00 a.m. in the tractor, pulling the trailer. Morin did not know how long they would be gone, where they were going, where they were going to stay, or the identity of the tractor or the trailer's owner. Morin was not employed by the company named on the side of the tractor, Dice Transport. Once he had been picked up at the Jack in the Box, he and Hernandez headed straight for Falfurrias, Texas, stopping only at a gas station in Encino, Texas where Morin took over the driving. The DEA agents did not make a recording of this statement or take a written statement from Morin.

Agent Minnick searched Hernandez's wallet and found a receipt dated January 19, 2009 from a Stripes convenience store in Mission, Texas. According to the testimony of Agents Minnick and Bedoya, Morin had not mentioned the Stripes store during the interview, despite their thorough questioning. The agents obtained the video surveillance tapes from the store for the thirty minutes before and after the time indicated on the receipt. The Stripes store had

---

[1] Morin and Hernandez were tried separately.

16 different security cameras, several of which caught footage relevant to the agents' investigation. Agent Minnick testified that she analyzed footage from the different cameras to arrive at her conclusions about what the video showed. Several portions of the video footage from these different cameras were played for the jury. Agent Minnick testified that the video evidence showed that at approximately 10:00 p.m. a red tractor with a white trailer similar to the one Morin was pulling when arrested backed up from the pump area, where it parked. A second red tractor closely resembling the one Morin drove to the border checkpoint pulled into pump number 11 at approximately 10:26 p.m., matching the pump and the time listed on the receipt. At that point, the first red tractor detached from the white trailer and pulled up to the pump in front of the second red tractor. A white vehicle called an Avalanche then pulled up behind the tractors about three minutes later, and several people walked from the tractors to the white vehicle where they appeared to talk together. The first red tractor then left, and the second red tractor could be seen backing up and attaching to the white trailer, then leaving the service area at approximately 10:53 p.m. Agent Minnick also testified that the video showed a person who appeared to be Morin inside the store at the cash register making purchases around this time.

Morin testified at the trial in his own defense. He stated that Hernandez called him around 7:00 p.m. on January 19 and asked him to go with him to Houston in the tractor-trailer. He had been friends with Hernandez for over 12 years, and Hernandez was the godfather of Morin's son. Hernandez picked Morin up at his house in Mission, Texas about 9:30 p.m. without the trailer attached and drove them to the Stripes store. At the Stripes store, they fueled the tractor and Morin went inside to buy some food and soft drinks while Hernandez paid for the fuel. When he left the store with his snacks, Morin saw the white Avalanche. Morin then got a ride back to his house from an

acquaintance who happened to be passing by the gas station because Morin wanted to say goodbye to his family.  Morin then had a friend named Oscar Cantu call a taxi that took him to the Jack in the Box restaurant, where he met Hernandez at approximately 12:00 a.m., at which time the trailer was already attached.  Morin and Hernandez then drove toward the Falfurrias checkpoint. About ten miles from the checkpoint, Morin took over the driving because Hernandez claimed to be ill.  Morin denied any knowledge that the trailer contained marihuana.  As discussed later in this opinion, Morin's testimony about his presence at the Stripes convenience store conflicts with the DEA agents' testimony about what Morin told them shortly after his arrest and in certain other respects.

Morin presented evidence tending to show that Hernandez was responsible for the marihuana, including evidence that Hernandez falsified the bill of lading. Morin did not present any testimony to corroborate his story about leaving the Stripes store, returning home, and then catching a taxi to the Jack in the Box restaurant.  Agent Minnick testified that she asked Morin for the contact information of his friend, Oscar Cantu, in order to corroborate Morin's statement that Cantu had called a taxi for him.  Agent Minnick testified that she called the number Morin gave her twice, and on both occasions a man answered the phone (on one occasion identifying himself as Morin's brother) and said that he did not know Cantu.

The prosecution presented a number of witnesses in support of its case. The jury heard from an employee of the produce company listed on the bill of lading who testified that the company had not been expecting any load of cabbage that day.  A witness from the ISPE warehouse testified that the bill of lading was an obvious forgery and that it did not correspond to any legitimate load of cabbage that had been scheduled for transport.  An employee of the Stripes convenience store testified regarding the particulars of the receipt and

5

the security cameras at the gas station.  The owner of the taxi company that Morin claimed picked him up at his house on January 19 testified that none of his drivers had any record of picking up a passenger in the vicinity of Morin's address on that evening.

During presentation of the government's case, Border Patrol Agent Ortiz and DEA Agent Minnick testified.  The prosecutor asked both agents questions about their experience and background.  On this appeal, Morin objects to the following testimony of Agent Ortiz, which occurred after some general questioning from the prosecutor about Ortiz's experience in narcotics cases.

> **Q**: Tell us a little bit about your understanding of how a drug organization works; where does [sic] the drugs come from, where do they go, in a general fashion?
> **Defense Counsel**: Judge, I'm going to object to it on the basis of relevancy and also confusing the jury, Judge, as far as organizations that are dealing with drugs.  This is a --
> **Court**: Only in the most general way.  But defendant himself is not accused of being a member of any organization or cartel from Mexico, but I think the jury is entitled to know generally − . . . the process by which − . . . the United States has these facilities and why.
> **Q**: In general where – the drugs that you catch at the checkpoint: Where are they coming from?  Where are they going?  What's going on?
> **A**: My understanding is most of this comes from Mexico.  It's grown in Mexico, harvested over there, packaged, and then transported north.  And it comes across the river either through the river itself or through a port of entry in compartments.
> **Q**: Secret compartments in vehicles?
> **A**:  Secret compartments in vehicles.
> **Q**:  Yeah.
> **A**: And from there it's transferred to another conveyance, 18-wheelers, buses, or walked around the checkpoint.
> **Q**: Okay.  And then, from there –
> **A**: It goes up north.
> **Q**: Once it gets past the checkpoint, what happens?

**A**: They take it north, wherever its destination is it's supposed to be going, and from there I guess they distribute it among –

**Q**: Well, various cities across the United States.

**A**: I would assume, yes.

**Q**: And from your experience and from what you've learned about drug organizations, are there many people involved in these sort of transportations?

**A**: Yes, sir.

**Q**: And the people that you're dealing with that you catch out there at the checkpoint: Normally, in general, what is their job? Where do they fit in?

**A**: I guess they're just the middleman, the people that actually transport it from point A to point B.  I mean –

**Q**: Okay.  Where does the checkpoint, in your experience – how does it – how does this trip from, say, Mexico to some city in the United States that the drugs are on, where does the checkpoint fit in?  How does it figure into what –

**A**: I would say the checkpoint would be considered, like, the choke point.

**Q**: The choke point?

**A**: A choke point, yes.

**Q**: What do you mean by that?

**A**: Well, as they bring their stuff down from the south, let's say, they have to take the highway or walk it through the brush.  But with large amounts of narcotics, its kind of hard to walk it through the ranches, so most of it they will drive through – try to drive through in compartments or concealed somewhere.  And at the checkpoint is, I guess it's the most vulnerable spot from them, you know.

**Q**: All right.  Most vulnerable?

**A**: Well, they get a – it's a higher risk of getting caught there –

**Q**: Okay.

**A**:  – at the checkpoint.

**Q**: All right.  And, in your experience, are some of the people that you catch there, their only job is just to get it through the checkpoint?

**A**: Correct.  That's what they usually do, just drive it from point A to point B, and that's it: that's all they do.

Morin also challenges the following testimony of Agent Minnick, which was given later in the trial.

No. 09-40702

**Q**: All right.  In your experience, would you expect somebody driving a tractor-trailer with a large load of marihuana in the back to have handled the bundles –
**Defense Counsel**: Objection, your Honor, calling for speculation, your Honor.
**Court:** Overruled.
**Q**: In your experience, would you expect someone driving a large load of marihuana to have handled the bundles that were in the back of their tractor-trailer?
**A**: No.  In my experience in all the cases that I've handled in the four years since I've been here and the Defendants I've spoken with, which it's been several – many, in fact – none of them loaded the marihuana onto their trailers.
**Q**: It's done by somebody else?
**A**: Yes.  It's done by somebody else.  It's more convenient for the organization as a whole because they don't want the people that are transporting –
. . .
**Q**: Well, let me ask you.  Is there a logical reason in your experience why the driver would not have handled the bundles?
**A**: Yes.   It's   more   convenient   for   the   organization.   They compartmentalize everything they do.  So they have the people at the warehouse.  They have the people that transport it across the river and they don't want one portion of the method of transporting the marihuana or packaging the marihuana – they don't want that portion to know about the other portion.  They keep everything very compartmentalized.  So once it come across the river, it's usually stored in a warehouse, usually rewrapped and then they would find a way of getting – and that's kind of what explains this video as well because they would get a way –
**Defense Counsel**: Your Honor, I would object to the nature of the answer that she keeps on going and going, your Honor.
**Prosecutor**: It's – she's explaining –
**Court**: Sustained.  Question and answer.
**Prosecutor**: Okay.
**Q**: Well, you were explaining the logic behind them not handling the bundles and you described the different compartments that drug organizations are normally organized in and so when they crossed the river, they come to – where do they put it after that?
**A**: Usually typically they store it in a stash house.

8

**Q**: All right.  Then what happens?

**A**: And then they – in order for their transportation, they arrange transportation by whatever method, car, tractor-trailer, whatever method they're going to use and usually someone from that organization – not the person that going to transport it from point A to point B – will take custody of a trailer or tractor or whatever conveyance they're going to use and will take it to a stash house to get it loaded.  They do not want the person that's going to transport the illegal drugs from point A to point B to have knowledge about where the stash location is.  Typically they do not want that person to have that knowledge.

**Q**: So in this video your theory is that somebody delivered the trailer to the Stripes store, dropped it off at least temporarily from the – from what we've seen and that with Mr. Morin and Mr. Hernandez there at the pumps.

**Defense Counsel**: Your Honor, he's leading the witness, your Honor.

**Court**: I'll allow it.  I think the testimony is a bit long and he's trying to sum it up –

**Prosecutor**: Yes.

**Court**: Because I know he's about to get through with the witness.

**Q**: So they dropped off the trailer.  They pulled up and then this Avalanche [the white vehicle] comes up and there's a meeting between everyone at the pumps and then Morin and Hernandez back up and get the trailer already loaded?

**A**: Yes, right.

**Q**: In your experience, this would be fairly common of how a drug organization would work?

**A**: Yes.

**Q**: And was there any indication in this – in your investigation that there was any legitimate load of cabbage on that trailer?

**A**: No.

Morin also claims that the following exchange between the prosecutor and Morin at trial was prejudicial and constitutes reversible error.

**Q**: And you've been a truck driver since 2001?

**A**: Perfect (phonetic).

**Q**: And how long have you had the cell phone that you had when you were arrested?

No. 09-40702

**A**: Well, it had been a while.  It had been a long while.
**Q**: Do you know or do you call other drug dealers?
**A**: No, sir.

This question elicited no objection from defense counsel.  But the district judge dismissed the jury shortly thereafter and chastised the prosecutor for asking this question, which the judge deemed to be "unfair" and "leading," as no evidence had been produced indicating that Morin had ever talked to any drug dealer.  The judge stated that he would declare a mistrial if the prosecutor asked any additional such questions.  Morin's counsel did not request a mistrial.  The prosecutor did not attempt to resume this line of questioning or make reference to this question at closing.  At the close of evidence, the district court gave the jury general instructions indicating that attorney comments do not represent evidence upon which the jury may rely.  Morin's counsel did not request a more specific curative instruction regarding the prosecutor's question.

## II.

"If the defendant objects, the district court's decision to admit testimony is reviewed for abuse of discretion and harmless error analysis applies." *United States v. Sanchez-Hernandez*, 507 F.3d 826, 831 (5th Cir. 2007).  If the defendant does not object, then plain error review applies.  *Id*.  The trial record indicates that defense counsel made a few objections during the testimony of Agent Ortiz and Agent Minnick, but these objections were not related to Morin's claim on appeal that their testimony constituted drug courier profiling.  Because Morin's trial counsel did not object on this basis, we review the district court's ruling admitting the alleged profiling testimony for plain error.[2]

---

[2] "An appellant must raise an objection to the admission of evidence at trial such that the issue is presented to the district court with sufficient specificity . . . . If the issue was not adequately raised at trial, we review only for plain error." *United States v. Burton*, 126 F.3d 666, 671 (5th Cir. 1997) (internal citations and quotation marks omitted).

No. 09-40702

Morin also admits that his trial counsel did not contemporaneously object to the prosecutor's challenged question regarding "other drug dealers," so plain error review applies to this argument as well. *United States v. Gracia*, 522 F.3d 597, 599-600 (5th Cir. 2008).

To demonstrate reversible plain error, the Appellant must show that "(1) there is error; (2) it is plain; and (3) it affected his substantial rights." *Id*. An error "must be 'so clear or obvious that the trial judge and prosecutor were derelict in countenancing it, even absent the defendant's timely assistance in detecting it.'" *United States v. Gonzalez-Rodriguez*, 621 F.3d 354, 363 (5th Cir. 2010) (quoting *United States v. Trejo*, 610 F.3d 308, 319 (5th Cir. 2010)). "As a general rule, an error affects a defendant's substantial rights only if the error was prejudicial." *Id*. (citing *United States v. Olano*, 507 U.S. 725, 734 (1993)). An error is prejudicial "if there is a reasonable probability that the result of the proceedings would have been different but for the error." *Id*. "The probability of a different result must be sufficient to undermine confidence in the outcome of the proceedings." *Id*. "The defendant bears the burden of demonstrating that a plain error affects his substantial rights." *Id*. (citing *Olano*, 507 U.S. at 734-35). Even if the defendant can meet this burden, "we do not exercise our discretion to correct the error unless it seriously affects the fairness, integrity, and public reputation of the judicial proceeding." *Id*.; *accord Gracia*, 522 F.3d at 599-600. "When a defendant does not timely object to an error at trial, satisfying the requirement for error is 'difficult, as it should be.'" *Gonzalez-Rodriguez*, 621 F.3d at 363 (quoting *Puckett v. United States*, 129 S. Ct. 1423, 1429 (2009)).

No. 09-40702

III.

A.

We first address Morin's challenge to the alleged profiling testimony of Agents Ortiz and Minnick.

1.

Expert testimony may be admitted pursuant to Federal Rule of Evidence 702 if the expert's "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence." Under Federal Rule of Evidence 704(b), however, expert testimony may not be admitted in a criminal case to show that the defendant had the requisite mental state to satisfy an element of the crime charged.

In the context of drug-related criminal trials, we have allowed law enforcement expert witnesses to give background testimony about "'the significance of certain conduct or methods of operation unique to the drug business so long as the testimony is helpful and its relevance is not substantially outweighed by the possibility of unfair prejudice or confusion.'" *Sanchez-Hernandez,* 507 F.3d at 831 (quoting *United States v. Garcia*, 86 F.3d 394, 400 (5th Cir. 1996)). On the other hand, however, "drug courier profiling" testimony is generally not admissible as substantive evidence of guilt because of its potential for including "innocent citizens as profiled drug couriers." *United States v. Williams*, 957 F.2d 1238, 1241-42 (5th Cir. 1992); *United States v. Brito*, 136 F.3d 397, 412 (5th Cir. 1998) (declaring that testimony is "inadmissible to prove substantive guilt based on similarities between defendants and a profile.").

A drug courier profile is "a compilation of characteristics that aid law enforcement officials in identifying persons who might be trafficking in illegal narcotics." *Sanchez-Hernandez,* 507 F.3d at 831; *Gonzalez-Rodriguez*, 621 F.3d at 363. Such testimony is usually sought to be admitted to show that because

a defendant matches the profile, he must have had "knowledge" of the drugs he was transporting. *Gonzalez-Rodriguez*, 621 F.3d at 363*; Sanchez-Hernandez,* 507 F.3d at 831; *United States v. Guitterez-Farias*, 294 F.3d 657, 662 (5th Cir. 2002). This kind of testimony is prohibited if it crosses the "borderline" between a "mere explanation of the expert's analysis of the facts" to a "forbidden opinion on the ultimate legal issue in the case." *Guiterez-Farias*, 294 F.3d at 663 (internal quotation omitted). A witness crosses this line by offering a direct opinion as to the defendant's mental state or by giving the "functional equivalent" of such a statement. *Id.* In particular, "such testimony is not admissible if it amounts to the 'functional equivalent' of an opinion that the defendant knew he was carrying drugs." *Gonzalez-Rodriguez*, 621 F.3d at 364 (quoting *Guiterez-Farias*, 294 F.3d at 663-64). Thus, "there is a fine but critical line between expert testimony concerning methods of operation unique to the drug business, and testimony comparing a defendant's conduct to the generic profile of a drug courier." *Id.*

2.

Applying these rules to the present case, it is clear that the majority of the agents' challenged testimony does not cross the critical line into profiling testimony. Almost all of Agent Ortiz's testimony comfortably falls into the permissible "background" variety. Most of his testimony was about the "conduct or methods of operation unique to the drug business." *Sanchez-Garcia*, 507 F.3d at 831. Agent Ortiz was largely "explaining to the jury based on [his] experience in patrolling the U.S.-Mexico border in that area how drug smuggling operations were conducted." *Id.* at 832. This testimony based on his knowledge and experience could have assisted the trier of fact. *Id.* at 833.

In contrast with cases in which we have found that drug courier testimony was admitted in error, Agent Ortiz did not offer direct testimony regarding Morin's mental state or its functional equivalent. *See Guiterez-Farias*, 294 F.3d

at 663 (involving an agent who testified that drug organizations look for drivers who have certain "knowledge," thereby directly suggesting that because most drivers have knowledge the defendant must have also had knowledge of the drugs); *United States v. Mendoza-Medina*, 346 F.3d 121, 128 (5th Cir. 2003) (involving an agent who testified as to the importance of "trust" between the distributor and driver, suggested that only "experienced" drivers are trusted with large amounts of drugs, and made other comparisons with the facts of the case that tended to imply that the defendant-driver had knowledge).  Other courier profiling cases have involved similar testimony, either directly or indirectly, about the defendant's mental state.  *See, e.g., Gonzalez-Rodriguez,* 621 F.3d at 366 (involving an agent who testified that defendant "must have known he was carrying drugs" because he falsified the log book)*; Ramirez-Velasquez,* 322 F.3d 868, 879 (5th Cir. 2003) (involving an agent who testified that drivers are chosen for their trustworthiness and past performance carrying drugs).  This type of mental-state testimony about Morin's knowledge of the drugs is absent from Agent Ortiz's testimony.

The one statement in Agent Ortiz's testimony that may have come close to crossing the line into profile testimony occurred when the prosecutor asked "the people that you're dealing with that you catch out there at the checkpoint: Normally, in general, what is their job?  Where do they fit in?" Agent Ortiz answered "I guess they're just the middleman, the people that actually transport it from point A to point B."  Morin's counsel argues that this statement is analogous to testimony in *Gonzalez-Rodriguez* that we recently held the district court plainly erred in admitting.  621 F.3d at 366-67 ("[T]he district court plainly erred in admitting Agent Crawford's testimony that the majority of people arrested at immigration checkpoints are couriers.").  Although similar to the statement in *Gonzalez-Rodriguez*, we are persuaded that in the overall context of Agent Ortiz's testimony this comment was simply part of his legitimate

No. 09-40702

background testimony. We read this portion of Agent Ortiz's testimony as part of his response to the prosecutor's general questions about how a drug organization works. He was explaining the various segments of the organization and the different roles played by individuals within these different segments. He explained that drugs are (1) grown in Mexico, (2) packaged in Mexico, and (3) finally transported north. In explaining the transporting segment of the organization, he explained the various ways the transporters move the cargo through or around the checkpoints. It was in this context that Agent Ortiz explained that most of the people he catches at the checkpoint are transporters, or middlemen, i.e., engaged in that segment of the organization. We do not read this testimony as a suggestion by Agent Ortiz that Morin was a middleman simply because he was arrested at a checkpoint. Neither Agent Ortiz nor the prosecutor ever classified or labeled Morin a "middleman" or used the term again at any later point in the trial. *See Brito*, 136 F.3d at 412 (involving an agent whose impermissible profiling testimony included labeling the defendants based on their roles in the drug organization). Thus, Agent Ortiz did not cross the line into profiling with the comment. As discussed further below, moreover, even if the district court erred in admitting this portion of Agent Ortiz's testimony, it did not affect Morin's substantial rights.

3.

Turning to Agent Minnick's testimony, we conclude that the majority of her testimony also falls within the benign category of "background" testimony. Most of her testimony cannot reasonably be interpreted to directly accuse Morin of having any knowledge of the drugs being transported or as indirectly implying the same based on comparison to a profile.[3] Like Agent Ortiz's testimony, most

---

[3] For instance, Agent Minnick's testimony that she has never encountered a driver who loaded the bundles of marihuana into the transporting vehicle was offered to rebut any inferences the jury may have drawn from the lack of Morin's fingerprints on the bundles. The

No. 09-40702

of Agent Minnick's testimony is not comparable to the testimony in cases in which an agent has testified that a defendant had knowledge of the drugs he was transporting based on comparison to a profile. *See Gonzalez-Rodriguez,* 621 F.3d at 366-67*; Mendoza-Medina*, 346 F.3d at 128; *Ramirez-Velasquez,* 322 F.3d at 879; *Guiterez-Farias*, 294 F.3d at 663.

The last part of Agent Minnick's challenged testimony, however, crossed the critical line into an impermissible comparison between a drug profile and Morin. During this portion of the testimony, Agent Minnick transitioned from giving background testimony about how drug organizations operate to describing her "theory" of the surveillance video from the Stripes convenience store. Her theory was that "somebody delivered the trailer to the Stripes store, dropped it off at least temporarily from the – from what we've seen and that with Mr. Morin and Mr. Hernandez there at the pumps . . . then this Avalanche [the white vehicle] comes up and there's a meeting between everyone at the pumps and then Mr. Morin and Mr. Hernandez back up and get the trailer already loaded." She further replied affirmatively when asked by the prosecutor if "this would be fairly common of how a drug organization would work."

We note first that the prosecutor was entitled to ask Agent Minnick to provide a summary of the video testimony and her expert opinion of it. Federal Rule of Evidence 1006 states that "[t]he contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation." This Rule "does not specifically address summary witnesses," but "[n]evertheless, for complex cases, this court has allowed summary witnesses in a limited capacity." *United*

---

prosecution is entitled to rebut this type of inference with background testimony. *See Sanchez-Garcia*, 507 F.3d at 833 (permitting prosecution to offer agent background testimony to rebut the defendant's innocent explanation that he was attempting to enter the country to work rather than smuggle drugs).

*States v. Nguyen*, 504 F.3d 561, 572 (5th Cir. 2007) (quotation marks omitted). In complex criminal cases – primarily cases involving complex financial documents but also including some drug cases – this court has also recognized that a government agent may "serve as 'an expert summary witness', in which capacity the witness may testify regarding his analysis of the subject matter of his expertise . . . ." *United States v. Castillo*, 77 F.3d 1480, 1499 (5th Cir. 1996) (regarding testimony by DEA agent about wiretap investigation of defendant convicted of possession with intent to distribute marihuana) (quoting *United States v. Moore,* 997 F.2d 55, 57 (5th Cir. 1993)).  The video evidence from 16 different security cameras, which Agent Minnick collected, was sufficiently voluminous and complex for the district court to allow Agent Minnick to offer her expert testimony summarizing the video and describing her analysis of it.  Video footage of the two red tractors, the trailer, the white Avalanche vehicle, and Morin were captured on a number of different cameras, and many of the images were blurred or otherwise difficult to see.  Morin and the vehicles moved in and out of the various cameras' ranges at different times.  Putting these video segments from different cameras together to create a coherent whole required substantial time and analysis by Agent Minnick.  Thus, it was not obvious or plain error to allow Agent Minnick to summarize the video evidence and assist the jury in understanding it.

However, Agent Minnick testified that (1) based on her interpretation of the video evidence, after everyone met at the pumps at the Stripes station, Morin and Hernandez backed up to the "already loaded" trailer that had been delivered to the Stripes station and attached that trailer to Hernandez's tractor; and (2) that "this would be fairly common of how a drug organization would work."  Thus, Agent Minnick, based on what she saw on the video evidence, gave an opinion that Morin and Hernandez were probably part of a drug organization who met the drug supplier at the Stripes store, and the drug supplier

No. 09-40702

transferred the trailer loaded with drugs to Hernandez and Morin for transport to a city in the United States. This testimony effectively conveyed to the jury that Morin, as a likely member of a drug organization, had knowledge that the trailer he and Hernandez were pulling was loaded with drugs. This part of Agent Minnick's testimony is unacceptable profile testimony. It is also unacceptable as part of her analysis of the video evidence. By implying that Morin was a member of a drug organization, Agent Minnick crossed the line from giving an explanation of the facts to advancing an impermissible opinion regarding Morin's mental state. *See Nguyen*, 504 F.3d at 572 (noting that by calling the defendant a "co-conspirator" during summary testimony, the government agent impermissibly implied that the defendant "had the requisite mental state for the criminal act" of fraud, because "one cannot be an unwitting conspirator"). The district court plainly erred in admitting this testimony.

As explained below, however, even though Agent Minnick crossed the line into profiling with this comment, we are persuaded that Morin has not carried his burden of proving that the erroneously admitted testimony affected his substantial rights under plain error review.

4.

Under plain error review, Morin has the burden of persuasion to show that the erroneously admitted testimony resulted in prejudice, thereby affecting his substantial rights. To carry this burden he must show "a reasonable probability that his trial would have come out differently but for the illegitimate aspects of" the agents' testimony. *Gonzalez-Rodriguez,* 621 F.3d at 367. We conclude that Morin has failed to bear this burden.

First, Morin and Hernandez shared the driving duties as they transported the drugs. The district court charged the jury that in reaching the issue of defendant's knowledge it could consider the fact that Morin was driving the vehicle as one factor. The district court explained, however, that the jury must

18

find other evidence in the case to find beyond a reasonable doubt that Morin had guilty knowledge that a controlled substance was hidden in the vehicle. This charge was not objected to, and that is the law that controls this case. *United States v. Redd*, 355 F.3d 866, 874 (5th Cir. 2003); FED. R. CRIM. P. 30 (d). The government produced a substantial volume of additional evidence demonstrating Morin's guilty knowledge that he and Hernandez were transporting a controlled substance.[4]

The most important evidence the government presented to the jury was the video taken at the Stripes store on which Morin appears. Morin admitted he was at the store during the time of the video. The jury was entitled to infer from the video that Morin was present when the trailer containing the marihuana was attached. The jury was also entitled to consider the suspicious circumstance of picking up a supposed load of produce at a gas station.

The jury also could have inferred his knowledge about the marihuana from multiple inconsistencies between Morin's testimony at trial and what he told the DEA agents during his initial interview after being taken into custody. Agent Minnick and Agent Bedoya testified that Morin never mentioned his presence at the Stripes store during this initial interview, despite their thorough questioning. Agent Minnick testified that she only learned of the Stripes store when she found the receipt in Hernandez's wallet. Although no recording was made of the initial DEA interview, and Morin contends that there are no inconsistencies between what he told the agents originally and his testimony at trial, the jury was entitled to credit the DEA agents' testimony and reject Morin's testimony.

---

[4] A defendant's state of mind cannot ordinarily be proved by direct evidence, and circumstantial evidence will suffice. *Williams*, 957 F.2d at 1243 (citing *United States v. Moye*, 951 F.2d 59 (5th Cir. 1992)).

No. 09-40702

The jury was further entitled to consider a large portion of Morin's testimony as a suspicious and less-than-convincing attempt to give a false, after-the-fact explanation for his failure to tell the DEA agents in his initial statement that he and Hernandez were at the Stripes gas station. *See Gutierrez-Farias*, 294 F.3d at 660-61 ("[A] 'less-than-credible' explanation is part of the overall circumstantial evidence from which possession and knowledge may be inferred."). Morin testified that an acquaintance who happened to be driving by the gas station gave him a ride home and that another friend named Oscar Cantu called a taxi to take him from his house to the Jack in the Box restaurant, the place where he told the agents that he met Hernandez. Morin did not call either of these people as witnesses at trial to corroborate his story, nor did he attempt to provide their contact information to the agents, who requested this information. Indeed, Agent Minnick testified that when she asked Morin for Cantu's contact information in order to seek such corroboration, Morin gave her the wrong number, which is a fact from which the jury could have inferred that Morin was either hiding the witness or fabricating the story entirely. Additionally, the jury heard testimony from the owner of the taxi company that he had no record indicating that any of his drivers picked up a passenger near the address of Morin's house that evening to take him to the Jack in the Box restaurant.

Further, the government presented the jury with testimony that the produce company listed on the falsified bill of lading was not expecting a load of cabbage that day. The prosecution also presented testimony from an employee of the ISPE warehouse that the bill of lading had been forged and did not correspond to a legitimate load of cabbage. The jury was entitled to infer that Morin, as one of the drivers of the tractor, would have been told where the cargo was to be delivered. The jury was also entitled to accept the prosecutor's theory that Morin and Hernandez had no lawful destination. The testimony presented

to the jury further established that Morin and Hernandez had been friends for over 12 years and that Hernandez was the godfather of Morin's son. Based on their close relationship, together with the evidence discussed above, the jury was entitled to believe that Morin was aware that he and Hernandez were transporting a controlled substance and reject Morin's explanation that Hernandez had deceived him in this respect.

Given the volume of evidence produced by the government of Morin's guilty knowledge that he and Hernandez were transporting an illicit cargo, we are persuaded that Morin has failed to demonstrate a reasonable probability that the outcome of his trial would have been different but for the illegitimate aspects of Agent Minnick's testimony. As we recently noted in *Gonzalez-Rodriguez*, however, "[w]ere it the government's burden to establish harmless error beyond a reasonable doubt, our conclusion today might be different." 621 F.3d at 367. Because the burden is Morin's to show the erroneously admitted evidence was harmful, we conclude that reversal is not warranted under plain error review. But we again "pause to caution that it is time for our able trial judges to rein in this practice" of permitting prosecutors to rely on opinion testimony that is unacceptable profile evidence. *Mendoza-Medina*, 346 F.3d at 125.

## B.

We next consider Morin's challenge to the prosecutor's question regarding whether he called or knew "other drug dealers." Under the three-step test for plain error review, it is clear to us, as it was to the district court, that the prosecutor's question satisfies the first two steps: it was an error and it was plain. Even though the defense did not object, the district judge sharply chastised the prosecutor for the question, referring to the question as "unfair," "leading," and "establishing a fact not in evidence." We agree that the question

was obviously improper as there was no factual predicate laid that Morin had made other calls to drug dealers.

However, as applied to an improper question from a prosecutor, the third step of plain error review "sets a high bar," and "the determinative question is whether the prosecutor's remarks cast serious doubt on the correctness of the jury's verdict." *Gracia*, 522 F.3d at 603. The district court obviously concluded that the question did not affect Morin's substantial rights, and our review of the record persuades us that this is correct. We decline to disturb the district court's ruling on this matter. *See United States v. Munoz*, 150 F.3d 401, 415 (5th Cir. 1998) ("The trial judge's on-the-scene assessment of the prejudicial effect [of a prosecutor's remark], if any, carries considerable weight.").

The prosecutor's question was a solitary, isolated event. The prosecution never attempted to raise the line of questioning again and did not refer to the question in closing. *See id.* (emphasizing that the prosecution "never made another reference" to the challenged testimony). The district judge further "mitigated the prejudicial effect" of the question through general instructions admonishing the jury that the remarks of the attorneys are not evidence and that the jurors must base their decision on evidence. *Id.* Importantly, the defense did not request a more specific curative instruction or move for a mistrial. Moreover, when viewed in the context of the proceedings as a whole and the totality of the evidence arrayed against the Morin at trial, as discussed more fully above, we are satisfied this isolated question did not affect the jury's verdict.

IV.

In sum, the portion of Agent Minnick's testimony that crossed the line into profiling testimony does not warrant reversal of Morin's conviction under plain error review because Morin has not demonstrated that admission of such

No. 09-40702

testimony affected his substantial rights.  The prosecutor's improper question also does not require reversal of the conviction under plain error review because Morin has similarly failed to demonstrate that this single question affected the jury's verdict.  For the foregoing reasons, the district court's judgment of conviction is AFFIRMED.