# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 13-40374

United States Court of Appeals
Fifth Circuit

**FILED**

June 11, 2014

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff–Appellee,

v.

SAN JUANITA NOEMI MEDELES–CAB,

Defendant–Appellant.

Appeal from the United States District Court
for the Southern District of Texas

Before STEWART, Chief Judge, and DENNIS and ELROD, Circuit Judges.

JENNIFER WALKER ELROD, Circuit Judge:

Defendant–Appellant San Juanita Noemi Medeles–Cab appeals her conviction for possessing with the intent to distribute more than five kilograms of cocaine. Medeles–Cab argues that the United States put on improper "drug courier profile" evidence during her trial. Medeles–Cab also argues that knowledge of the type and quantity of drugs is an element of the offense of conviction and that the United States failed to prove that element. Because we disagree that the evidence at issue amounted to an improper drug courier profile and because we recognize that Medeles–Cab's knowledge argument is foreclosed by our precedent, we AFFIRM.

No. 13-40374

I.

This case arose out of a drug seizure at a border patrol checkpoint near Laredo, Texas.[1]  Border Patrol agents first interacted with Medeles–Cab, a Mexican citizen, when she arrived at the checkpoint in a Volkswagen GTI. Three of Medeles–Cab's children were also in the car.  In her initial exchange with the agents, Medeles–Cab presented a set of travel documents, demonstrating her lawful presence in the country.[2]  After a drug dog "alert[ed] to the rear bumper" of the car in the course of a routine inspection, the agents directed Medeles–Cab's car to "secondary inspection."  The more thorough secondary inspection revealed approximately ten kilograms of cocaine in a hidden compartment in the rear of the car.  Medeles–Cab was arrested and eventually indicted for possessing with the intent to distribute more than five kilograms of cocaine, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A), and for conspiring to do the same.  Medeles–Cab went to trial.

Medeles–Cab's theory at trial was that she had no knowledge of the drugs in the car.  Medeles–Cab testified that she merely was headed to San Marcos, Texas, to do some shopping and that, as a favor to a friend, she also was planning to pick up some money in San Antonio, Texas.  To establish that Medeles–Cab knew that she was transporting drugs, the United States presented evidence of Medeles–Cab's on-scene statements as well as her communications with others via cell phone, including text messages and call records.  In addition, through Agent Joseph Osborne of the Drug Enforcement Agency, the United States put on evidence pertaining to the business of drug

---

[1] We present the facts in the light most favorable to the conviction as we must.  *See United States v. Thomas*, 690 F.3d 358, 366 (5th Cir. 2012).

[2] Medeles–Cab presented a B1/B2 visa, which allows a non-citizen to enter the country to shop and conduct business up to 25 miles inside the border, and an I-94 permit, which allows a non-citizen to pass beyond 25 miles.

No. 13-40374

trafficking. After explaining that he had become familiar with the value of cocaine "locally and elsewhere in the United States" as a result of his experience with cocaine investigations, Agent Osborne testified that the market price for a kilogram of cocaine is between $22,000 and $25,000 in Laredo and between $25,000 and $28,000 in San Antonio. Agent Osborne also testified thus:

Q:  [I]n this particular case how many kilos are involved again?
A:  Approximately ten kilos.
Q:  Okay. So looking at the low end in Laredo, the approximate value would be how much?
A:  [A]bout 220,000.
Q:  Okay. And looking at the high end in Laredo at 10 kilos at 25,000, what would be the approximate value?
A:  [250,000].
       . . . .
Q:  Okay. And so at the low end, again, sticking to the amount in this particular case, ten kilos, at the low end in San Antonio at 25,000 a kilo it would be what amount?
A:  [250,000].
Q:  And at the high of 28,000 per kilo, how much would that be?
A:  [280,000].
Q:  All right. Now what accounts for the increase between Laredo and San Antonio?
A:  Well, as . . . the cocaine moves north from Mexico it actually increases from going—crossing the river there's an increase in price and then again crossing the checkpoint there's an increase in price. *There's money paid to the driver*, money to the person who set it up, and then they share the profits and then they also kick some of the profits back to the person who sent them so that the difference in price should go up.
Q:  And so as the drugs or in this particular case the cocaine goes further say from San Antonio what's going to happen to the value of that particular load?
A:  The farther it goes typically the more expensive it is. There's more risk involved taking it further into the country and *they have to pay somebody to take it so the price continues to go up*.

3

No. 13-40374

Medeles–Cab did not object to this testimony. Later, in closing argument, the prosecutor argued the following to the jury:

> She's going to deliver a load of cocaine—14 bundles, ten kilos. That's the other thing that was going on here. I'm sure she was going to do some shopping. Hey, take advantage of it. You're already there. Go shopping. She was going to get paid. You can surmise that too. You're delivering ten kilos of cocaine you're going to get paid a pretty good amount of money. I'm sure she's going to have a lot of money to shop.

Medeles–Cab did not object to this argument.

The district court denied Medeles–Cab's motion for acquittal. Particular to this appeal, the district court gave the following jury instruction regarding the knowledge element of the possession offense: "The government must prove beyond a reasonable doubt that the defendant knew she was possessing a controlled substance, but need not prove the defendant knew which particular controlled substance was involved." The jury convicted Medeles–Cab on the possession count and acquitted her on the conspiracy count. The district court sentenced Medeles–Cab to the statutory minimum of 120 months in prison.

On appeal, Medeles–Cab characterizes Agent Osborne's testimony as an improper drug courier profile, specifically seizing on two phrases—"There's money paid to the driver" and "they have to pay somebody to take it so the price continues to go up." Conceding that plain error review applies, Medeles–Cab argues that the admission of that testimony requires reversal of her conviction. In addition, Medeles–Cab argues that the prosecutor's remarks exacerbated the impropriety of the drug courier profile. Medeles–Cab also argues that the prosecutor's remarks were improper in their own right because they were not supported by the evidence.

In a separate point of error, Medeles–Cab argues that, under § 841, the United States must prove that the defendant has knowledge of the type and

4

No. 13-40374

quantity of drugs underlying the offense and that the United States failed to satisfy that burden.

## II.

We review Medeles–Cab's challenge to Agent Osborne's testimony and the prosecutor's closing argument for plain error. *See United States v. Gonzalez–Rodriguez*, 621 F.3d 354, 362–63 (5th Cir. 2010). The first step in plain-error review requires us to determine if the error is "clear or obvious" under current law. *Id.* at 363. An error is "clear or obvious" if "the trial judge and prosecutor were derelict in countenancing it, even absent the defendant's timely assistance in detecting it." *Id.* (internal quotation marks omitted). Second, if the error is clear, we consider whether the error affected the defendant's substantial rights. *Id.* Under this second prong, the defendant has the burden of demonstrating that the error was prejudicial, which requires a showing that the error undermines confidence in the outcome of the trial. *Id.* To clear the last hurdle of plain-error review, we must decide whether the error seriously affected "the fairness, integrity, and public reputation of the judicial proceeding." *Id.*

The crux of Medeles–Cab's argument is that Agent Osborne "improperly told, or at the very least suggested to, the jury that Ms. Medeles–Cab was knowingly involved in . . . the transportation of drugs." The United States, of course, disagrees. To settle this dispute, we begin with Federal Rule of Evidence 704(b): "In a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged . . . . Those matters are for the trier of fact alone." Two basic principles derive from this rule. First, "a qualified narcotics agent typically may testify about the significance of certain conduct or methods of operation unique to the drug business," as long as the testimony complies with Federal Rule of Evidence 403. *Gonzalez–*

5

*Rodriguez*, 621 F.3d at 363; *see United States v. Gutierrez–Farias*, 294 F.3d 657, 663 (5th Cir. 2002). Second, such testimony crosses the line into that which Rules 704 and 403 prohibit "if it amounts to the 'functional equivalent' of an opinion that the defendant knew he was carrying drugs." *Gonzalez–Rodriguez*, 621 F.3d at 363 (quoting *Gutierrez–Farias*, 294 F.3d at 663). A so-called "drug courier profile" is generally inadmissible "because of its potential for including innocent citizens as profiled drug couriers." *United States v. Morin*, 627 F.3d 985, 995 (5th Cir. 2010) (internal quotation marks omitted).

A drug courier profile is "'a compilation of characteristics that aid law enforcement officials in identifying persons who might be trafficking in illegal narcotics.'" *United States v. Sanchez–Hernandez*, 507 F.3d 826, 831 (5th Cir. 2007) (quoting *United States v. Williams*, 957 F.2d 1238, 1242 (5th Cir. 1992)). In "pure profile evidence" cases, "law enforcement personnel seek to testify that because a defendant's conduct matches the profile of a drug courier, the defendant must have known about the drugs he was transporting." *Gonzalez–Rodriguez*, 621 F.3d at 363. Repeatedly, we have held that "drug courier profile evidence is 'inadmissible to prove substantive guilt based on similarities between defendants and a profile.'" *Id.* at 364 (quoting *United States v. Brito*, 136 F.3d 397, 412 (5th Cir. 1998)). Whatever the profile's benefits to investigation and apprehension, in a federal prosecution, the fact that a defendant fits a drug courier profile may not be used to establish her guilt. *Williams*, 957 F.2d at 1242. It is the evidence of the defendant's actual connection to drug trafficking that must form the basis of the conviction. *Id.* As these principles suggest, a "fine but critical line" separates "testimony concerning methods of operation unique to the drug business" and "testimony comparing a defendant's conduct to the generic profile of a drug courier." *Gonzalez–Rodriguez*, 621 F.3d at 364. "The former may permissibly help a jury understand the significance and implications of other evidence presented at

trial. The latter may impermissibly suggest that an innocent civilian had knowledge of drug activity." *Id.* (citations omitted).

Our cases demonstrate that inadmissible drug courier profile testimony involves an agent drawing a direct connection between a drug courier characteristic (or characteristics) and the defendant in order to establish the defendant's guilt. If, on the other hand, the agent merely testifies to certain characteristics of drug trafficking, without drawing the connection, the testimony is generally admissible. We encountered the former in *Gutierrez–Farias*. There, the agent testified that, when seeking couriers, upper-level managers of drug trafficking organizations often "approach individuals that have knowledge [and are] involved in this kind of business." 294 F.3d at 662. The agent further explained that usually the courier is "a friend of a friend" because the managers want people that "have a certain amount of trust and responsibility." *Id.* The agent thus drew the connection between carrying drugs and having knowledge of those drugs. As we summed up the agent's testimony: "In most drug cases, the person hired to transport the drugs *knows* the drugs are in the vehicle." *Id.* at 663 (emphasis added). Because we considered this to have crossed the line between a permissible analysis of the facts and a "forbidden opinion on the ultimate legal issue," we held that the district court had abused its discretion in allowing the testimony. *Id.* (internal quotation marks omitted).

Certain portions of the testimony in *Gonzalez–Rodriguez* stand in contrast. In *Gonzalez–Rodriguez*, where drugs were discovered in a vehicle transporting grapefruit, there was no error with respect to the agent's testimony

> that most large quantity methamphetamine is produced in Mexico; that drug organizations use couriers to transport drugs to the United States for distribution; that drug organizations often transport drugs by hiding them in seemingly legitimate places;

> that couriers normally do not handle drugs; that a courier probably would not have been the person who hid the methamphetamine in the grapefruit; and that [the testifying agent] therefore was not surprised when he did not find [the defendant's] fingerprints on the bundles of methamphetamine.

621 F.3d at 365. We explained that the testimony presented "relatively little risk" that the defendant's conviction was based on evidence "other than his actual connection to the drug trafficking crime." *Id.* The testimony did not amount to an opinion that the defendant was guilty because he fit a profile; instead it permissibly addressed the "basic business model" for running large quantities of drugs across the border. *Id.*

Four discrete aspects of the agent's testimony in *Gonzalez–Rodriguez* constituted clear or obvious error, however, given the direct connection drawn between drug courier characteristics and the defendant: (1) The agent testified that "drug couriers generally have no criminal history," which "suggested to the jury that [the defendant] was a drug courier *because* he had no criminal history." *Id.* at 366. (2) The agent testified that "law enforcement officers look for legitimate [cargo] to identify drug couriers," which "suggested that [the defendant] was a drug courier *because* he was transporting a legitimate load of grapefruits." *Id.* (3) The agent testified that the defendant "must have known about the drugs because he falsified the [grapefruit carrier's] log book." *Id.* The court declared that it was for the jury to determine whether the defendant had falsified the log book and, if so, whether that suggested knowledge of the drugs; it was plain error for the agent "to draw the connection." *Id.* (4) The agent testified that "the majority of people arrested at immigration checkpoints are couriers," which "implied that [the defendant] was a drug

8

courier, and therefore knew he was carrying drugs, *because* he was arrested at a checkpoint." *Id.* at 366–67.[3]

*Morin* also provides examples of both permissible and impermissible testimony in this context. The lion's share of the testimony amounted to a permissible explanation of the "conduct or methods of operation unique to the drug business." 627 F.3d at 995 (internal quotation marks omitted). The testimony consisted of statements that: (1) most drugs coming into the country illegally originate in Mexico; (2) the drugs are transported across the border in secret compartments and are then moved northward; (3) most of the people arrested for smuggling drugs across the border are "middlem[e]n," driving the drugs "from point A to point B"; (4) drug couriers generally do not handle the bundles of drugs involved because drug trafficking organizations have a division of labor; and (5) after the drugs are transported across the river they are transferred to another individual to be transported to a stash house for further distribution. 627 F.3d at 991–93. We concluded that these agents did not offer direct testimony regarding the defendant's knowledge of the drugs. *Id.* at 995–96. Calling the third piece of testimony "close to crossing the line" and "similar" to the statement in *Gonzalez–Rodriguez* that "the majority of people arrested at immigration checkpoints are couriers," we nevertheless found no error because that testimony did not amount to a suggestion that the defendant "was a middleman simply *because* he was arrested at a checkpoint." *Id.* at 996 (emphasis added).

The impermissible testimony in *Morin* involved an agent providing her interpretation of a video that depicted the defendant in a convenience store parking lot. *Id.* at 993. The agent explained that the defendant was attaching

---

[3] Even though the admission of this testimony was clear or obvious error, we concluded that it was not reversible error, as the defendant could not establish the prejudice prong of plain-error review. *Gonzalez–Rodriguez*, 621 F.3d at 368.

an "already loaded" trailer of drugs to his vehicle, which was, in her estimation, "fairly common of how a drug organization would work." *Id.* We concluded that this amounted to an opinion that the defendant was "probably part of a drug organization" and knowingly received the drug-laden trailer from a drug supplier. *Id.* at 998. This, we held, was unacceptable drug courier profile testimony and therefore plain error. *Id.*[4]

We conclude that Agent Osborne's testimony in this case fits comfortably within that category of permissible testimony that includes explanations of conduct or methods of operation unique to the drug business. The testimony here is properly viewed as a part of Agent Osborne's explanation of the economics of trans-border drug trafficking. Indeed, Agent Osborne testified that the farther goods must travel, the more expensive the goods become. Agent Osborne also testified that someone gets paid for transporting the goods. These are facts about the drug trafficking business, and we therefore consider the testimony in this case to be similar to the permissible portions of testimony in *Gonzalez–Rodriguez* and *Morin*. In other words, Agent Osborne testified about a business model. The testimony does not compare to the testimony in *Gutierrez–Farias*, where the agent effectively—and bluntly—testified that if the defendant was driving the car, then the defendant had knowledge of the drugs. Agent Osborne did no such thing.

Moreover, Agent Osborne did not define the characteristics of a drug courier and then link Medeles–Cab to those characteristics. In *Gonzalez–Rodriguez*, the improper portions of testimony amounted to the following conditional statement: *if* the defendant had no criminal history, *if* the defendant was transporting legitimate cargo, and *if* the defendant was

---

[4] As in *Gonzalez–Rodriguez*, although we concluded that the error was plain, we did not reverse. *Morin*, 627 F.3d at 1000.

arrested at checkpoint, *then* the defendant had knowledge of the drugs. Agent Osborne, however, described the economic reality that the drugs increase in price as a result of transportation costs. Agent Osborne did not testify that Medeles–Cab was paid for the act of driving the car, and he did not imply that, if she was paid, then she must have had knowledge of the cocaine. In fact, Agent Osborne did not testify that payment in these situations always establishes knowledge. The jury was free to construe Agent Osborne's testimony as providing an alternative explanation to why Medeles–Cab was driving to San Antonio—i.e., to deliver drugs for money, not simply to go shopping and do a favor for a friend. But Agent Osborne left it for the jury to draw the connection between Medeles–Cab being paid for driving the car and her knowledge of the cocaine.[5] There is thus "relatively little risk" that Medeles–Cab's conviction was based on Agent Osborne's explanation rather than her "actual connection to the drug trafficking crime." *See Gonzalez–Rodriguez*, 621 F.3d at 365. Accordingly, the district court did not err—much less plainly err—in admitting this testimony.

The prosecutor's closing argument does not alter our conclusion. "A prosecutor is confined in closing argument to discussing properly admitted evidence and any reasonable inferences or conclusions that can be drawn from that evidence." *United States v. Mendoza*, 522 F.3d 482, 491 (5th Cir. 2008). The prosecutor here discussed the reasonable inference that—in light of the amount of cocaine, the value of the cocaine, and her actual transportation of

---

[5] Furthermore, Agent Osborne did not testify that a specific act performed by Medeles–Cab indicated to him that she had knowledge of the drugs. *Cf. Morin*, 627 F.3d at 998 (finding error where agent testified that in her opinion the defendant's act of hitching a trailer at a convenience store indicated that the defendant was probably part of a drug organization); *Gonzalez–Rodriguez*, 621 F.3d at 366 (finding error where agent testified that the defendant's act of falsifying the carrier's log book indicated that the defendant knew about the drugs in the vehicle).

the cocaine—Medeles–Cab was going to get paid. In fact, the prosecutor made it clear that these remarks were inferences, telling the jury, "You can surmise that." There was no error here.

### III.

We review Medeles–Cab's sufficiency challenge *de novo*. *United States v. Chon*, 713 F.3d 812, 818 (2013). Medeles–Cab argues that the evidence was insufficient to establish that she knew the type and quantity of drugs in her possession. Medeles–Cab argues that, under § 841, the United States must prove, and the jury must find, beyond a reasonable doubt that the defendant has such knowledge. As Medeles–Cab concedes, however, this argument is foreclosed by *United States v. Betancourt*, 586 F.3d 303 (5th Cir. 2009). In *Betancourt*, we held that the knowledge element in § 841(a)(1) does not apply to the type and quantity of drugs listed in § 841(b)(1). *Betancourt*, 586 F.3d at 308–09. The district court therefore did not err in denying Medeles–Cab's motion for acquittal. Moreover, to the extent that Medeles–Cab challenges the propriety of the jury instructions regarding the knowledge element of the possession count, we see no error. The district court instructed the jury in accordance with *Betancourt*.

AFFIRMED.